IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SOPHIA AIRA, et al.

Plaintiffs,

v.

CITY OF ATLANTA, et al.

Defendants.

CIVIL CASE NO.:
1:24-cv-03344-TRJ

## THIRD CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES

COME NOW Plaintiffs Sophia Aira, Gina Dickhaus, Laurel Leckert, Gillian Maurer, Melanie Noyes, and Abby Walter in the above styled action and file this their Consolidated Amended Complaint for Damages pursuant to this Court's Order dated May 14, 2025.

This is a civil rights action under 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments to the United States Constitution and Georgia law. The Plaintiffs allege that they were illegally and unconstitutionally detained and arrested by Defendant Officers Jessica Bruce, Anthony Ewing, Jamar Reed, John

1

Patton, Deronald Davis, James Fraser, and Sidney Smith, of the City of Atlanta Police Department and Georgia State University Police Department, and maliciously prosecuted in violation of the Fourth Amendment of the United States Constitution and Georgia law. All defendants – including the City of Atlanta - conspired to deprive Plaintiffs of their constitutional rights. Plaintiffs also allege that they were arrested and prosecuted in retaliation for the exercise of their First Amendment rights, and that Defendant City of Atlanta through Major Jessica Bruce conspired in the false arrest, malicious prosecution, and first amendment retaliation, that is the subject of this suit. Finally, Plaintiffs allege that a final policy maker within the City of Atlanta – Major Jessica Bruce - ordered the arrest of the Plaintiffs and insisted on their prosecution as a result of Plaintiffs' First Amendment protected activity.

## PARTIES

1.

Plaintiff Sophia Aira is a resident of the State of Illinois, Plaintiff Laurel Leckert is a resident of the State of New York, and Plaintiffs Gina Dickhaus, Gillian Maurer, Melanie Noyes, and Abby Walter are residents of the State of

North Carolina.  All Plaintiffs are United States citizens, and over the age of eighteen.

2.

Defendant Jessica Bruce is an Officer employed by the City of Atlanta Police Department. The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Defendant Jessica Bruce may be served at this address. At all times relevant to this lawsuit, Defendant Jessica Bruce acted under the color of law. Defendant Jessica Bruce is sued in his individual capacity.

3.

Defendant Anthony Ewing is an Officer employed by the Georgia State University Police Department. The headquarters of the Georgia State University Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant Anthony Ewing may be served at this address. At all times relevant to this lawsuit, Defendant Anthony Ewing acted under the color of law. Defendant Anthony Ewing is sued in his individual capacity.

3

4.

Defendant Jamar Reed is an Officer employed by the Georgia State University Police Department. The headquarters of the Georgia State University Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant Jamar Reed may be served at this address. At all times relevant to this lawsuit, Defendant Jamar Reed acted under the color of law. Defendant Jamar Reed is sued in his individual capacity.

5.

Defendant John Patton is an Officer employed by the Georgia State University Police Department. The headquarters of the Georgia State University Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant John Patton may be served at this address. At all times relevant to this lawsuit, Defendant John Patton acted under the color of law. Defendant John Patton is sued in his individual capacity.

6.

Defendant Deronald Davis is an Officer employed by the Georgia State University Police Department. The headquarters of the Georgia State University

Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant Deronald Davis may be served at this address. At all times relevant to this lawsuit, Defendant Deronald Davis acted under the color of law. Defendant Deronald Davis is sued in his individual capacity.

7.

Defendant James Fraser is an Officer employed by the Georgia State University Police Department. The headquarters of the Georgia State University Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant James Fraser may be served at this address. At all times relevant to this lawsuit, Defendant James Fraser acted under the color of law. Defendant James Fraser is sued in his individual capacity.

8.

Defendant Sidney Smith is an Officer employed by the Georgia State University Police Department. His badge / unit number is 349. Defendant Smith's full first name is currently unknown and will be corrected at a later date. The headquarters of the Georgia State University Police Department are located at 15 Edgewood Ave SE, Atlanta, GA 30303 in Fulton County, Georgia. Defendant

Sidney Smith may be served at this address. At all times relevant to this lawsuit, Defendant Sidney Smith acted under the color of law. Defendant Sidney Smith is sued in his individual capacity.

9.

Defendant City of Atlanta ("the City") is a political subdivision of the State of Georgia, which has the capacity to sue and be sued. The City can be served at: 55 Trinity Ave. SW, Atlanta GA 30303. At all times relevant to this lawsuit, Defendant City of Atlanta acted under the color of law.

10.

All defendants reside in the Northern District of Georgia.

**JURISDICTION AND VENUE**

11.

This case presents a federal question and this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12.

Under 28 U.S.C. §§ 1331 and 1343(a)(3)&(4), the Court can entertain an

action to redress a deprivation of rights guaranteed by the United States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear an action to redress a deprivation of rights guaranteed by the laws and the Constitution of the State of Georgia.

13.

This Court has personal jurisdiction of the Defendants under 28 U.S.C. § 1367 and GA. CONST., art. I, § 1, ¶¶ V, XIII.

14.

Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this judicial district and Defendants reside within this district.

15.

All of the parties herein are subject to the jurisdiction of this Court.

16.

Attorney's fees are authorized under 42 U.S.C. § 1988.

**FACTUAL ALLEGATIONS**

17.

On July 29, 2022 a group of approximately 50 individuals arrived in the general area of the Georgia State University Convocation Center located at 455 Capitol Avenue in Atlanta. The individuals were there to protest against the construction of the Atlanta Police Training Facility also referred to as the Cop City.

18.

The Atlanta Public Safety Training Center, also known as "Cop City," is a controversial project and has been the subject of local, national, and international media coverage.

19.

The protesters walked towards the Convocation Center building which – although almost completed – was at the time still technically under construction and not open to the public. There were no signs in the area, however, that would alert the public that the building was still under construction or that the public was not allowed to enter. While approaching the building the protesters were chanting and clapping.

8

20.

Some of the protesters entered the building and some of the protesters remained outside of the building on the sidewalk. The protesters that entered the building walked through some of the areas while chanting and clapping and encountered a few construction workers inside of the building. Construction workers told protesters to exit the building which the protesters did. Protesters that entered the building spent no more than two or three minutes inside the building. Plaintiffs Gina Dickhaus, Gillian Maurer, Melanie Noyes, and Abby Walter specifically allege that they did not enter the building.

21.

Upon exiting the building the protesters encountered Defendant Anthony Ewing, a Georgia State University police officer in his uniform. Defendant Ewing told the protesters to "Get out of here!" which the protesters did. Defendant Ewing did not stop the protesters at the time and protesters left the area.

22.

Some time later Defendant John Patton engaged in search of and pursuit of the protesters and spotted a burgundy Subaru on Martin Street approximately half a

mile from the Convocation Center. The Subaru was parked and not moving at the time and sitting inside were Abby Walter, Gillian Maurer, Melanie Noyes and Sophia Aira. Defendant Patton immediately detained Abby Walter, Gillian Maurer, Melanie Noyes and Sophia Aira with the assistance of GSU Police Officer Sidney Smith and others.

23.

A short time later Laurel Leckert, Gina Dickhaus and Raymond Surya were also detained nearby pursuant to the direction of Defendant Patton.

24.

All seven detained individuals were handcuffed and made to sit on the curb in the hot sun for several hours while other law enforcement agencies arrived on the scene and allegedly conducted investigation and/or other actions.

25.

While not all of the communications between and within various law enforcement agencies are known to the Plaintiffs at this time the following is known as alleged in the following paragraphs.

26.

One of the "other" law enforcement agencies that arrived on the scene during the time of detention was the City of Atlanta Police Department. Specifically Major Jessica Bruce – who currently serves as a Deputy Chief of the City of Atlanta Police Department arrived at the scene and engaged in conversation with Officer James Fraser as well as other officers. Defendant Bruce urged the GSU Officers to stretch the charges against detained individuals to help City of Atlanta fight the opponents of "Cop City." Specifically – after an unidentified Georgia State University police officer stated that the conduct of protesters was "not really chargeable" Defendant Bruce stated: "a … anything we can … anything guys … anything we can get would help us out tremendously with this group … I know it's a reach." After this statement Defendant Frasier turned off his body camera to conceal the remainder of the conversation.

27.

In an effort to justify the detention initiated by Defendant Patton Defendant Jamar Reed reached out to construction workers at the Convocation Center. He asked two workers to come with him to the site where the individuals were

11

detained to conduct a show-up. Defendant Reed explained to the construction workers that police has caught individuals who went inside the Convocation Center but needed the construction workers as witnesses. When speaking with the construction workers Jackson Bussey and Moses Paige Defendant Reed stated among other things: "Yea - we got them. We just want to bring you all over here ... so you all can ID them for us," and "...we will need some information ... just so we can say you all verified ... y'all saw them in the building ... these are the ones we have..." Defendant Reed then drove Bussey and Paige to Martin Street where individuals who were detained were located.

28.

Rather than having Bussey and Paige take a good look at each detained individual separately - Reed instead stopped his police vehicle approximately 50 feet away from detained individuals who were sitting on the curb and had Bussey and Paige state that "that's them" upon which Reed drove Bussey and Paige back to the Convocation Center without Bussey and Paige ever exiting the police vehicle when allegedly identifying the protesters.

29.

To the extent that Brasfield & Gorrie employees Bussey and Paige made any inculpatory statements they were made at Defendant Reed, Defendant Deronald Davis', and others' prompting.

30.

At no point did Bussey and Paige indicate that there was any property damage done inside the Convocation Center by the protesters.

31.

At all times all of the defendants knew the purpose and intent behind the entry into the Convocation Center by those protesters who actually entered. That intent was to protest against the construction of the police training facility and that intent was plainly obvious from protesters' actions. At no time was there any evidence or information upon which any of the defendants could possibly base a belief that the intent possessed by the protesters was to commit a felony inside the building.

32.

At no time was there any evidence or information upon which any of the

defendants could possibly conclude that any property damage was done inside the building by the protesters.

33.

Because defendants did not like the political message that the protesters were advocating defendants conspired to charge all detainees with crimes they knew protesters did not commit - as follows:  Criminal Damage To Property in the 2nd Degree - Felony OCGA 16-7-23, Burglary in the Second Degree - Felony, OCGA 16-7-1(c), and Obstruction of Law Enforcement Officer - Misdemeanor, OCGA 16-10-24. After detention lasting several hours detainees were placed under arrest for said charges and booked. Defendant Ewing wrote citations for this plaintiff and swore warrants for arrest against this plaintiff for each of the above charges.

34.

Defendant Ewing knew that the information presented to the magistrate to obtain warrants was false or should have known that it was false.

35.

Defendant Ewing conspired with other defendants to detain, arrest, and

charge the detained protesters with crimes they did not commit and despite the fact that all defendants knew or should have known that none of the detained individuals committed any crime under the law.

36.

Contrary to the allegations in the warrant affidavits none of the individuals protesting caused any damage and did not obstruct any law enforcement officers. Officer Ewing appeared on the scene of the Convocation Center when the protesters were in the process of exiting at which time Officer Ewing gave them a verbal command to "Get out of here." All protesters complied with that command.

37.

Likewise there was no arguable probable cause to arrest or charge any of the protesters with any other crime. For example none of the protesters could have been arrested or charged with criminal trespass since at the time of their entry there were no posted signs and they have not received a criminal trespass warning by an owner or an authorized person. Rather - the protesters (even those that actually entered the Convocation Center) exited the building within minutes of their entry and immediately after they were told by the workers to leave. Protesters then

immediately complied with the order of Defendant Ewing to depart the area which they did. Nevertheless protesters were then pursued and detained approximately half a mile from the Convocation Center, arrested and charged as described above.

38.

Jessica Bruce arrived on the scene where detained individuals were held as a high ranking officer in the capacity of representing the City of Atlanta, City of Atlanta Police Department and an interagency "joint task force" that was assembled to combat the opposition to Cop City. Jessica Bruce arrived there while individuals were being detained and sitting on the curb. The purpose of Jessica Bruce's arrival was that this was a protest involving opposition to Cop City and Jessica Bruce is tasked within the City of Atlanta Police Department with combating the opposition to Cop City and with surveillance of activists that are opposed to Cop City. In this capacity Jessica Bruce routinely visits sites of protests against Cop City and was at the site of another protest that is the subject of a separate lawsuit pending in this Court Gadomski v. City of Atlanta (Case 1:23-cv-04036-TWT)

16

39.

A "Joint Task Force" consisting of different agencies was formed in early 2022 to combat the opposition to Cop City and to address criminal activity taking place in the area of the "protest" against the new training center. The task force consisted of different agencies at different times as the participation of particular agencies varied depending on the type of operation. The following agencies are the ones that participated in the joint task force at one time or another: Atlanta Police Department (APD), Georgia Bureau of Investigation (GBI), Federal Bureau of Investigation (FBI), Georgia Attorney General's Office, DeKalb County Police Department, DeKalb County District Attorney's Office, Georgia State Patrol, and Georgia Department of Natural Resources.

40.

Given the fact that the police training center was going to be built within the City of Atlanta – the City of Atlanta Police Department assumed a leadership role within the joint task force from the very beginning.

41.

Indeed – according to GBI agent Mike Carter: "GBI is an assisting agency.

17

We don't have original jurisdiction, so we have to be kind of invited to participate in this investigation." Carter further explained that "back in April of 2022, Chief Schierbaum requested assistance from GBI to our director at the time, Vic Reynolds, that they requested GBI assistance in the Training Center property and some of the troubles they were having there." According to Carter "our director, after speaking with Chief Schierbaum, got GISAC and the GBI involved. And our roles at that time were to assist processing evidence, evidence collection, interviews and trying to identify, collect as much intelligence as we could about exactly what was going on at that time. And that started in April of 2022."

42.

The responsibilities of all agencies consisting of the joint task force were to support the Atlanta Police Department.

43.

Within the Atlanta Police Department Special Enforcement Section was tasked with combating the opposition to Cop City and any criminal activity related to Cop City. The Homeland Security Unit was tasked with monitoring social media posts related to the City of Atlanta's Public Safety Training Facility. The Homeland

Security Unit is part of the Special Enforcement Section. Jessica Bruce was the commander of the Special Enforcement Section from March of 2022 until February of 2024. As such – Jessica Bruce was in charge of the units directly responsible for combating the opposition to Cop City and with surveillance of activists that were opposed to Cop City. She routinely reported on the progress of those activities to Chief Schierbaum who himself was involved in day to day management of Stop Cop City issues. Chief Schierbaum would also circulate emails containing action items for Jessica Bruce to complete with regards to Cop City. Chief Schierbaum is a final policy maker within the City of Atlanta for the purposes of issues involved in this litigation.

44.

In addition to her collaboration with Chief Schierbaum on tasks related to Cop City Jessica Bruce on at least one occasion updated Mayor Andre Dickens personally regarding an operation related to Cop City. Mayor Dickens is a final policy maker within the City of Atlanta for the purposes of issues involved in this litigation.

45.

Plaintiffs hereby allege that either Chief Schierbaum or Mayor Dickens or both had knowledge of Jessica Bruce's actions on the day in question, encouraged and / or asked for those actions ahead of time or at a minimum ratified Jessica Bruce's actions after the fact.

46.

Given Jessica Bruce's leadership role within the City of Atlanta with regards to combating the opposition to Cop City and with surveillance of Cop City opponents it should come as no surprise that on the day in question Jessica Bruce was the person who represented the City of Atlanta Police Department and the City of Atlanta itself (along with the rest of the joint task force) at the scene where Plaintiffs were detained.

47.

While it is not yet clear (at this pleading stage) who contacted who first – it is known that at some point officers of the Georgia State University Police Department were informed that "Homeland Security" was on its way to the scene. GSU Police Officers understood that given the nature of the incident involving the

protest against Cop City they were to take a step back and let the City of Atlanta take the lead. Indeed – this is what GSU Police Officers did.

48.

Had Jesica Bruce not arrived at the scene on the day in question GSU Police Officers would have completed their investigation in a drastically shorter time as they wouldn't have to wait for anyone. Their investigation would have revealed that (1) no probable cause existed that any of the detained individuals were in the building, that (2) even if they were in the building they were not guilty of trespass because there were no signs advising them that they were not allowed to enter and they complied with instructions to depart the premises. Based on this the officers would have released the Plaintiffs after a brief detention at the most.

49.

When Jessica Bruce appeared on the scene GSU Police officers appeared eager to please her and to impress her. Jessica Bruce stated: "Y'all getting some of our people - huh?" Defendant Fraser responded: "You'd be surprised how many people don't think we'll chase them. They see the last word that says "University" and don't take us serious. And then before you know it we got twelve cars here -

and they're all on the curb."

50.

Jessica Bruce's statement that the detained individuals were "their people" was just another one of many overt manifestations that Jessica Bruce – on behalf of the City of Atlanta - intended to take charge. GSU Officers eagerly complied. After Defendant Bruce started urging the GSU officers to stretch the charges against Plaintiffs Defendant Fraser promptly turned off his body worn camera to help conceal further discussions and facilitate the conspiracy the officers were engaging in together with Defendant Bruce.

51.

By her actions Jessica Bruce caused detention of Plaintiffs to last longer than it would have otherwise (since Plaintiffs would have been released had Defendant Bruce not urged serious charges) and she caused Plaintiffs to be arrested and ultimately charged with serious crimes listed in Paragraph 33.

52.

The warrants for Plaintiffs' arrests have not been sworn or issued until after 10:30pm on the day in question while the protest is alleged to have happened at

1:39pm that day.

53.

In their zeal to stamp out any dissent or speech not favorable to the construction of the training center ("Cop City") defendants also arrested an AJC reporter Benjamin Hendren who was never in the vicinity of the protest at the Convocation Center – but instead arrived at the site on Martin Street to film the events after the protesters were already detained. Hendren's arrest is subject of yet another pending lawsuit in this Court (Case 1:24-cv-02921-TWT).

54.

Abby Walter, Gillian Maurer, Melanie Noyes, Sophia Aira, Laurel Leckert, Gina Dickhaus, and Raymond Surya were all indicted in the Superior Court of Fulton County on the above mentioned charges of Criminal Damage To Property, Burglary, and Obstruction of Law Enforcement Officer. All of them were offered a pretrial diversion by the District Attorney's office and all except Laurel Leckert and Gina Dickhaus accepted that offer. Those who accepted the pretrial diversion offer had their cases dismissed as evidenced by the filings on this Court's Docket. Laurel Leckert and Gina Dickhaus did not accept the pretrial diversion and instead

23

filed a motion with the Superior Court of Fulton County to suppress the show-up identification which motion was granted. Following the grant of the motion to suppress the cases against Laurel Leckert and Gina Dickhaus were dismissed on October 24, 2024.

55.

As such Plaintiff Laurel Leckert and Gina Dickhaus' cases were favorably terminated on October 24, 2024. Plaintiffs Sophia Aira, Gillian Maurer, Melanie Noyes, and Abby Walter had their cases favorably terminated in the following months as evidenced by the filings on this Court's Docket.

56.

During the criminal prosecution of the Plaintiffs in this case all Plaintiffs steadfastly protested their complete innocence. District Attorney's office offered pretrial diversion to all Plaintiffs. All plaintiffs except Dickhaus and Leckert accepted the diversion. Dickaus and Leckert rejected the diversion offer and insisted that their motion to suppress the show-up be heard.

57.

At the beginning of the motion hearing on May 7, 2024 Assistant DA

Rosenbaum re-iterated the diversion offer to Leckert and Dickhaus and threatened

that if they dare to go forward with their motion to suppress the show-up this offer

will be withdrawn and the State will seek custodial time. The following colloquy

ensued:

MS. ROSENBAUM: Yes, Your Honor. Before calling the witnesses, I just want to put on the record, Your Honor, you recall that earlier today we had an extensive discussion about the diversion program, and the State did provide the information to defense counsel about the diversion program that this defendant had already been accepted into. After confirming that information, they have notified me that she is rejecting the diversion, which I have had this discussion with the attorney already, and I just wanted to put on the record, make sure that -- I'm sure she discussed it with her client. But I just want to put on the record that diversion will no longer be an option, once we start the hearing today. I had also offered to nolle prosequi the felony charge. It is the burglary and the criminal damage, and proceed with two misdemeanors; criminal trespass and misdemeanor obstruction of officers. Had offered a sentence of two consecutive misdemeanors, so a total of 24 months, suspended, with the conditions being no further violations of the law and stay out of Georgia, and it's my understanding that that has also been rejected. So that will probably be an offer that the defendant will not see again, but I just wanted it put on the record, get confirmation. I'm sure defense counsel conveyed them, but just to make sure so that the issue doesn't come up at a later date, if necessary, that the defendant was not aware of the offers that she is turning down going forward.

THE COURT: Okay. Before I get that confirmation, I would like to confirm one thing. So the charges I'm looking at are burglary in the second degree, criminal damage to property in the second degree, and willful obstruction of law enforcement officers. Can you tell me what the sentencing range is on those offenses?

25

MS. ROSENBAUM: The burglary second is, I believe, one to ten, the criminal damage is one to five, and the misdemeanor is up to 12 months.

THE COURT: Okay. And, Ms. Barron, I'm certain that you have discussed these matters with your client in terms of communicating to her the option for pretrial intervention, which would result in no conviction at all is how it's supposed to work, the option for a plea to two misdemeanors that would result in, I think, a suspended probationary sentence, so still a conviction, but two misdemeanors, with essentially no supervision or any requirement on the back end, and that, instead, Ms. Leckert wishes -- yes, Ms. Leckert, you have discussed that with her -- and wishes, instead, to go forward on the burglary, criminal damage to property in the second degree, and willful obstruction, understanding that potentially, if convicted of these charges, she could be looking at 16 years of custodial punishment?

MS. BARRON: Yes, Your Honor, both offers have been conveyed to my client and it is her desire to proceed to trial.

THE COURT: Okay.

MS. ROSENBAUM: And, Judge, just to put a final point on it again, because I want it all on the record, at this point, if the defendant is convicted at trial, the expectation is we would be asking for a sentence that is, at least in part, custodial.

58.

After a lengthy hearing that lasted two days the judge granted the motion to suppress the show up. In the order dated August 12, 2024 the judge stated among other things: "This Court has little trouble concluding that Officer Reed's multiple comments to the witnesses on the way to the showup identification crossed the line and were impermissibly suggestive. *** [Reed] repeatedly said [the witnesses]

26

were just needed to confirm that the suspects were at the Convocation Center. He told the witnesses that police already "got' em" and that the witnesses just needed to "ID' em for us," so that police could later say "y'all verified, y'all saw' em in the building, these are the ones we have." Indeed, the showup here was a textbook example of what not to do, rendering it little more than a check-the-box exercise to bolster the Defendants' arrest."

59.

Following this ruling granting the motion to suppress the show-up the State dismissed all charges against Leckert and Dickhaus.

60.

The remaining defendants – as mentioned – accepted pretrial diversion.

61.

According to Epiffany Henry, Adult Diversion Director for Fulton County Diversion Program "Diversion Participants are not required to admit guilt at any time while in the program. The case will be placed on Judicial Hold during the enrollment period and once all program obligations have been completed, the case will be Dismissed and the record is restricted. As part of the program, we complete

those Orders and provide verification once everything has been filed. We assist enrolled participants with wraparound services such as job searches, resume writing, interview techniques and educational enrollment assistance. We aim to reduce recidivism rates by providing early rehabilitation interventions."

62.

Indeed for all Plaintiffs that entered the Diversion Program the judge – upon completion of the program - contemporaneously with entering the nole prosequi also entered an order to restrict the record from public access and to seal any references to arrest and disposition in other public records such as complaint room documents available on Odyssey.

63.

In this particular instance the cases that were referred to diversion were placed on a judicial hold. Judicial hold means that the prosecution of the cases was deferred while Defendants completed a Pre-Trial Adult Diversion Program.  If Defendants successfully completed the conditions of diversion, their case was going to be dismissed.  If Defendants failed to complete the conditions or were arrested for new criminal conduct, the State was going move forward with the

prosecution of their case. In other words – had defendants failed to complete the diversion (even after accepting it) they would not automatically be found guilty. Rather - their case would simply be put back in the pipeline to be prosecuted – which could result in any outcome that a prosecution can normally result in – including a finding of not guilty, dismissal or any other type of termination. In the present cases – however – the Plaintiffs that accepted diversion completed the conditions of diversion and their charges were dismissed pursuant to the orders of nolle prosequi that were filed with this Court on the docket.

64.

Pretrial diversion in this case is to be distinguished from a first offender adjudication. Under Georgia First Offender Act, the defendant typically pleads **guilty or nolo contendere** to the charge. <u>See</u> OCGA 42-8-60. The court will then impose a sentence, which may include probation, community service, fines, or other conditions. If the offender successfully completes the terms of their sentence, the case is dismissed, and the offender will not have a formal criminal conviction.

65.

The main difference between the first offender treatment and a pretrial

diversion is that first offender dismissal happens "upon a guilty verdict or plea of guilty or nolo contendere" but a dismissal following a pretrial diversion happens **without any admission of guilt**.

66.

As such - the dismissal of charges following a pretrial diversion is a type of termination that is "not inconsistent with a plaintiff's innocence." Laskar v. Hurd, 972 F.3d 1278 (11th Cir. 2020).

## COUNT I
### 42 U.S.C. § 1983: Unlawful Seizure in violation of the Fourth Amendment
### (As to all Defendants except City of Atlanta)

67.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

68.

The conduct of Defendants in causing and procuring the arrest and detention of Plaintiffs without arguable probable cause constituted an unreasonable seizure of their persons in violation of the Fourth Amendment. Defendant Bruce caused that seizure by means of using her authority as a high ranking officer of the City of

Atlanta Police Department while the GSU Police Officers felt obligated to follow her lead and comply with her urging to fabricate charges against all Plaintiffs given that Atlanta Police Department plays a leading role in the joint task force created to combat the opposition against building of the training center and Jessica Bruce is the person in charge within the APD when it comes to Stop Cop City issues.

69.

The law being clearly established in 2022 that an officer of the state cannot cause someone to be arrested and prosecuted without arguable probable cause, Defendants are not entitled to qualified immunity.

**COUNT II**
**42 U.S.C. § 1983: Malicious Prosecution in violation of the Fourth**
**Amendment**
**(As to all Defendants except City of Atlanta)**

70.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

71.

Defendants caused a criminal prosecution to be initiated against Plaintiffs for the offenses described above.

31

72.

Defendant Ewing not only caused the prosecution to be initiated, and arrest to be executed, but he caused the prosecution to continue based on his arrest warrant affidavit and police report such that all Plaintiffs had to endure criminal cases which have terminated in their favor. Other defendants are liable for said prosecution due to conspiring with Defendants Ewing and Bruce to arrest and prosecute all Plaintiffs without arguable probable cause and in retaliation for their speech. Defendant Bruce is liable for said prosecution because her persuasion was the determining factor in inducing the charging decisions.

73.

Defendants knew that there was no probable cause to support the charges against Plaintiffs, but they persisted in initiating, participating in, and assisting with that prosecution despite the complete lack of probable cause.

74.

Said prosecution was based upon statements by Defendants that were either knowingly false or made with reckless disregard for the truth.

75.

Accordingly, said prosecution was carried on maliciously and without probable cause, and has terminated in Plaintiffs' favor. The prosecution was brought in bad faith and without a reasonable expectation of obtaining a valid conviction as all defendants knew that there was no probable cause for any of the charges – yet conspired to fabricate the charges because this will help Defendant Bruce and The City "tremendously" with "this group." And "with this group" they mean the opponents of the City of Atlanta's Public Safety Training Facility.

76.

The law being clearly established in 2022 that an officer of the state cannot knowingly make false statements in order to cause someone to be prosecuted for an offense that is not supported by probable cause, Defendants are not entitled to qualified immunity.

## COUNT III
## Municipal Liability
### (As to Defendant City of Atlanta)

77.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

78.

The City is liable under the Monell doctrine because there was a decision by a final policy maker to arrest all Plaintiffs or to conduct arrests in cases such as Plaintiffs', as well as to press false charges against Plaintiffs.

79.

The City has a long history of not adequately training its officers when it comes to protecting and respecting citizens' First Amendment rights which includes violating citizens' rights to film the police that ultimately resulted in a contempt order against the City in 2015.

80.

The City also routinely arrests protesters under the pretext of violating pedestrian in the roadway laws with numerous instances of such arrests occurring during 2020 protests, a mass arrest on January 6, 2021 that is the subject of a

pending lawsuit before this Court (Baker v. City of Atlanta et al. 1:21-cv-04186-

MLB) where 19 protesters were corralled and arrested for pedestrian in the

roadway within minutes of starting to protest, and another mass arrest in May of

2022 when a number of Stop Cop City protesters were arrested in Inman Park and

also charged with pedestrian in the roadway. Baker case involved an order given by

a high ranking officer to arrest all protesters on the scene. There is an official

policy or directive by final policy maker(s) within the City of Atlanta to engage in

practice of arresting protesters under the pretext of violating pedestrian in the

roadway laws and the City – if not deliberately promoting this policy – is at the

very least deliberately indifferent to it.

81.

Another example of an arrest of a protester under the pretext of violating

pedestrian in the roadway laws occurring during 2020 protests referred to above is

a case pending in this Court styled Schilling v. Doherty, Case No.: 1:22-cv-03772-

MLB. In this case a high-ranking officer Lieutenant Kevin Knapp who was in

charge of the City of Atlanta police unit at the scene singled out several individuals

from a crowd of protesters by pointing them out to other APD officers, identifying

35

them as the ones that should be arrested by saying: "This one has to go, this one has to go…" while pointing at individual protesters to be arrested. There was no indication or explanation on behalf of Lieutenant Knapp as to why those individuals should be arrested. Some time after this identification for the purpose of the arrest Donovan Schilling was arrested under the pretext of an alleged violation of pedestrian in the roadway statute which allegedly occurred after the above mentioned identification and thus could not possibly have formed a basis for Lieutenant Knapp's singling out Mr. Schilling for arrest. Schilling was arrested by Lieutenant Knapp and officer Michael Doherty. Schilling sued alleging – inter alia – first amendment retaliation and the case is currently pending in this Court. Lieutenant Knapp has since been promoted to Captain.

There are numerous other instances of similar pretextual arrests of protesters for pedestrian in the roadway violations from 2020 protest period that further discovery will reveal.

82.

A high ranking officer in the above mentioned <u>Baker</u> case was Lieutenant Gary Harper. Harper has since been promoted to Major and ultimately to a Deputy

36

Police Chief. A first amendment retaliation claim has likewise been brought in Baker case.

83.

The above referenced Inman Park mass arrest from May of 2022 occurred on May 14, 2022 in Inman Park – a public park. This mass arrest of approximately 15 individuals followed a different "Stop Cop City" Protest and was a carefully executed action where only those protesters who were deemed more vocal / more dedicated to the cause were targeted out of a much larger group of protesters. Those protesters were ultimately arrested in a public park where they could not have possibly been violating pedestrian in the roadway laws. Indeed all but one of the May 14, 2022 arrestees had their charges dismissed, and the sole remaining one is currently awaiting an accusation in the State Court of Fulton County but has not been accused to date.

84.

Related to the May 14, 2022 arrests and on the same day were the arrests of Melanie Silverstein, Ahley Dixon and Ryan Michael Seal. Dixon and Silverstein were arrested on a public sidewalk while walking home from the protest and

charged with pedestrian in the roadway. Dixon and Silverstein were singled out by Major Jeff Cantin because one of them was carrying a "Stop Cop City" sign. Dixon and Silverstein were arrested by Major Cantin who upon information and belief was assisted by other officers in arresting the two. Dixon's and Silverstein's charges were likewise dismissed.

85.

Ryan Michael Seal was a reporter who was arrested in Inman Park on May 14, 2022 on pedestrian in the roadway charges and was transported to the City of Atlanta Detention Center. There Mr. Seal was released without charges. However, his reporter's notebook was confiscated and never returned. Upon information and belief Mr. Seal was arrested because he was deemed to be a part of the "Stop Cop City" movement and because it was expected that his notebook would yield valuable intelligence about the movement. In other words Mr. Seal was arrested because of his First Amendment protected activities and in retaliation for those activities.

86.

The complaint of Michael Watchulonis in Watchulonis v. City of Atlanta

1:23-cv-2204-TCB - yet another case pending in this Court – alleges First Amendment violations surrounding the detention of Mr. Watchulonis – a reporter – where Mr. Watchulonis was interrogated by above mentioned Major Jeff Cantin and a GBI agent Mike Carter, threatened with arrest if he does not delete his footage, and then released without charges. Said complaint contains a long list of First Amendment violations by the City of Atlanta of the right to film described therein which are hereby incorporated by reference in order to save space and cut down on the verbosity of the present complaint.

87.

The above described numerous recent instances of pretextual arrests of protesters on pedestrian in the roadway charges, as well as more broad examples of First Amendment violations committed by members of APD and with full knowledge of Defendant City of Atlanta (as described in more detail in Watchulonis complaint) show deliberate indifference by the City as to the need to properly train officers on First Amendment protections generally and as to illegality of using pedestrian in the roadway charges as a pretext to retaliate and / or attempt to suppress protesters' speech. Had officers been properly trained on the

first amendment protections as it comes to protests the constitutional violations alleged in the present case would not have occurred. The involvement of the high ranking officers in the above mentioned violations (Lieutenant, Captain and Major) and the fact that said officers are routinely promoted subsequent to those violations show that the City has full knowledge (let alone constructive knowledge) of those violations and is not only deliberately indifferent to them but is in fact actively promoting them. This knowledge is further demonstrated by the fact that the Baker mass arrest was discussed at a City Council meeting soon after it happened – negating any possible claim of ignorance on behalf of the City.

88.

While the present case does not involve a pedestrian in the roadway charge it does involve a protest in opposition to Cop City much like the case of Gadomski v. City of Atlanta (Case 1:23-cv-04036-TWT) where this Court denied a motion to dismiss based on a final policy maker theory. It is no secret that the City of Atlanta itself is squarely on the side of building the training center as is evidenced by the City Council votes and City being actively engaged in litigation to prevent the issue from being placed on a referendum despite more than one hundred thousand

signatures asking the City to do so. The City's Police department likewise has without exception acted to conduct arrests at Cop City protests where arrests are otherwise not conducted - as evidenced by several above listed examples. The present complaint alleges pretextual arrests based on very serious charges while most of the other violations cited involve pretextual arrests based on pedestrian in the roadway charges. This is a distinction without a difference. Every single instance of violation cited involves pretextual arrests of protesters made in retaliation for their first amendment protected activity. And a great majority of the examples listed involve first amendment protected activity related to the opposition to building the police training facility. It is not only plausible – but it is a well known fact – worthy of judicial notice – that the City of Atlanta (as an entity – not just the Atlanta Police Department) has taken a clear stance on which side of this political debate it is on. The city of Atlanta is actively engaged in fighting the opposition to "Cop City." The City has fought and is still fighting against a referendum on the issue despite 116,000 signatures on a petition that demand the referendum to be had. The City has engaged in various tactics to prevent the referendum – including but not limited to ordinance amendments and litigation to

stall and or prevent the vote. As a high ranking officer within the City of Atlanta Defendant Jessica Bruce (currently a Deputy Police Chief) is one of the main individuals charged with fighting the fight against the so called Cop City opponents. In an affidavit dated February 16, 2023 Jessica Bruce described surveillance she is conducting of the opponents of the "Cop City": "The Homeland Security Unit is part of the Special Enforcement Section that I command. The duties of the Homeland Security Unit include monitoring social media posts related to the City of Atlanta's Public Safety Training Facility." She further stated that: "By virtue of being the commander of the Special Enforcement Section, I am aware of numerous incidents of property damage, vandalism, and violence related to the development of City of Atlanta's Public Safety Training Facility." Jessica Bruce then lists the protest that is the subject of this very complaint as one of the incidents of property damage, vandalism, and violence related to the development of City of Atlanta's Public Safety Training Facility as follows: "July 29 / Protest and vandalism at Georgia State University / 7 arrested / Protest at a B&G construction site (approximately 40 protestors)." As is evidenced from the above allegations of the present complaint Jessica Bruce arrived at the site of the arrests

on July 29, 2022 as someone that is playing a leadership role in combatting the opposition to Cop City, then urged GSU Officers to fabricate charges against the arrestees, and after succeeding in this endeavor she listed the arrests as one of the examples of "property damage, vandalism, and violence related to the development of City of Atlanta's Public Safety Training Facility" in her February 16, 2023 affidavit. Rather than being a rouge officer – Jessica Bruce has on that day acted under the direction of the City of Atlanta, the Chief of Police and the City government in attempting to stamp out the opposition against Cop City.

89.

Finally – the fact that Major Jessica Bruce – one of the most high ranking officers in the City of Atlanta Police department was dispatched to a scene of an incident where nothing more than a few minutes long entry into a building by Cop City protesters was alleged – speaks for itself. The Chief of Police of the City of Atlanta knew what Defendant Bruce was doing. In fact this is what she was expected to do. In addition – the Chief of Police ratified Major Bruce's conduct.

43

## COUNT IV
## O.C.G.A. § 51-7-40: Malicious Prosecution
### (As to all Defendants except City of Atlanta)

90.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

91.

This claim is brought by Plaintiffs Leckert and Dickhaus only.

92.

Defendant officers initiated a criminal prosecution against all Plaintiffs, and they knew or should have known that no arguable probable cause existed to believe that any of the Plaintiffs had violated any laws or committed any crime recognized by law.

93.

Defendant officers initiated and maintained the arrest and prosecution of all Plaintiffs with malice, as interpreted under Georgia law. The prosecution was brought in bad faith and without a reasonable expectation of obtaining a valid conviction as all defendants knew that there was no probable cause for any of the charges – yet conspired to fabricate the charges because this will help Defendant

Bruce and The City "tremendously" with "this group." And "with this group" they mean the opponents of the City of Atlanta's Public Safety Training Facility.

94.

This criminal prosecution has terminated favorably for all Plaintiffs.

95.

As a result of the arrest and prosecution, all Plaintiffs have suffered physical, emotional, mental and financial injury, entitling them to recover nominal, compensatory and punitive damages against Defendant officers for the loss of their rights under this claim, in an amount to be determined by the enlightened conscience of a fair and impartial jury.

**COUNT V**
**42 U.S.C. § 1983: First Amendment Retaliation in violation of the First Amendment**
**(As to all Defendants except City of Atlanta)**

96.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

97.

Defendants deliberately initiated and or caused arrest and prosecution

against all Plaintiffs because Plaintiffs exercised their rights to free speech and participated in a protest. Plaintiffs were targeted for arrest because they were part of a protest. Plaintiffs would not have been arrested but for their exercise of their First amendment rights.

98.

Defendants' actions were meant to punish the Plaintiffs for their exercise of their First Amendment rights and to prevent them from further speaking and continuing to protest in the future.

99.

The intentional actions of Defendants in falsely accusing Plaintiffs of crimes interfered with Plaintiffs' right of freedom of speech and expression in violation of the First Amendment to the US Constitution.

100.

The law being clearly established in 2022 that an officer of the state cannot make false statements or make an arrest to retaliate against a person for their exercise of freedom of speech, Defendants are not entitled to qualified immunity.

101.

Plaintiffs allege that they were arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech or expression had not been arrested.

102.

Plaintiffs allege that no person has been arrested under the above described circumstances when they were not engaged in the type of protected speech Plaintiffs were engaged in.

103.

Had Plaintiffs not been protesting Defendant officers would not have arrested them. This is evidenced by the common knowledge that officers typically exercise their discretion not to arrest in cases of brief entry into a building even when probable cause is present. Plaintiffs ask that the Court take judicial notice of same or allow Plaintiffs to gather evidence of such typical exercise of discretion during discovery. Plaintiffs allege that Defendant officers had no arguable probable cause to arrest them for any crime and nothing in this complaint should be construed as an admission or allegation that arguable probable cause existed for

any crime.

## COUNT VI
### 42 U.S.C. § 1983: Conspiracy to violate constitutional rights
### (As to all Defendants)

104.

Paragraphs 1 through 66 are hereby re-alleged as if fully pled herein.

105.

Defendant Jessica Bruce was dispatched to the scene as a high ranking officer of the City of Atlanta Police Department and to speak on behalf of the City to the officers of the Georgia State University Police Department.

106.

Defendant Bruce urged other defendant officers to falsely charge protesters with crimes. Defendant Bruce conspired with all other defendants to illegally detain, arrest and falsely charge protesters with crimes they did not commit and to conceal said actions from the public.

107.

Defendant Fraser participated in the concealment aspect of the conspiracy by

turning off his body worn camera when Defendant Bruce started talking about stretching charges against the protesters.

## DAMAGES

108.

Paragraphs 1 through 107 are hereby re-alleged as if fully pled herein.

109.

As a direct and proximate result of the above described conduct of Defendants, Plaintiffs were unreasonably and unlawfully arrested and prosecuted without probable cause and as a retaliation for exercising their First Amendment rights, were imprisoned and deprived of their liberty, were subjected to physical restraint, confinement, physical and mental suffering and emotional distress that is expected to continue into the future, and were forced to incur other economic and non-economic losses for which Defendants are liable to Plaintiffs in an amount to be proven at trial and determined by the enlightened conscience of fair and impartial jurors.

110.

The aforementioned misconduct of Defendants rose to such a level of bad

faith, willfulness, and reckless disregard as to authorize the imposition of punitive damages against each one of them. Plaintiffs do not seek punitive damages against the City of Atlanta.

111.

Plaintiffs are also entitled to recover reasonable attorney's fees and expenses of litigation pursuant to 42 U.S.C. §1988.

**WHEREFORE**, Plaintiffs demand the following:

a) That this action be tried by a jury;

b) That judgment be entered in favor of each Plaintiff and against each Defendant for nominal, special, compensatory and punitive damages for each violation of the Plaintiffs' constitutional rights in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c) That Plaintiffs be awarded attorney's fees and reasonable expenses of litigation;

d) That all costs of this action be taxed against Defendants; and

e) That the Court award any additional or alternative relief as may be

deemed appropriate under the circumstances.

Respectfully submitted this 20th day of May 2025.

/s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange, Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dcepar@gmail.com