**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SOPHIA AIRA, et al.

Plaintiff,

v.

CIVIL ACTION FILE NO.
1:24-cv-03344-MHC

CITY OF ATLANTA, et al.

Defendants.

**CITY OF ATLANTA'S AND MAJOR JESSICA BRUCE'S BRIEF IN
SUPPORT OF MOTION TO DISMISS PLAINTIFFS' THIRD
CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES**

All claims against the City should be dismissed because Plaintiffs have failed

to meet the high bar for liability under *Monell*. Furthermore, all claims against

Deputy Chief Bruce should be dismissed because she is entitled to qualified and

official immunity.

## INTRODUCTION

On May 14, 2025, this Court held a hearing on the City's and Deputy Chief

Bruce's (formerly a Major) Motion to Dismiss Plaintiffs' Amended Consolidated

Complaint for Damages. At the conclusion of the hearing, the Court dismissed

Aira's, Walter's, Maurer's, and Noyes' state law malicious prosecution claims and

Plaintiffs' punitive damages claims against the City. The Court subsequently denied

1

without prejudice the other issues raised in the motion and ordered the six plaintiffs (collectively, "Plaintiffs") to amend their complaint to address certain issues. More particularly, the Court desired additional facts regarding the pretrial diversion program entered into by four of the Plaintiffs. The Court also questioned the composition of the joint task force referenced by Plaintiffs. Lastly, the Court inquired as to Deputy Chief Bruce's liability for conduct that occurred before her arrival. In other words, how can the conduct of the Georgia State University ("GSU") officers be imputed to Deputy Chief Bruce or the City of Atlanta?

Plaintiffs were involved in a protest when they were detained by GGSU police officers. These officers are named defendants. Deputy Chief Bruce, a City police officer, later arrived and allegedly urged the GSU officers to charge the protesters or stretch the charges against the protesters. All of Plaintiffs' claims against Deputy Chief Bruce surround the fact that Plaintiffs believe they were arrested and prosecuted without probable cause. Plaintiffs believe that they were a target because of their involvement in the protest(s).

Plaintiffs also attempt to hold the City liability for this incident. To do so, Plaintiffs identify a supposed policy/custom of the City that the City routinely arrests protesters under the pretext of a Pedestrian in the Roadway violation. Furthermore, Plaintiff contends that the City inadequately trains its officers regarding citizens' First Amendment rights which include the right to film the police. To be clear, the

2

City denies these allegations.  However, even if true, these theories do not carry the day – Plaintiffs were neither charged with a Pedestrian in the Roadway violation, nor were they filming police activity on the day of the arrests.  These references to past incidents are red herrings.  Assuming *arguendo* that such customs/policies exist, they cannot be the "moving force" behind any alleged constitutional violation here, because Pedestrian in the Roadway charges did not occur here nor do Plaintiffs allege that they were filming police activity.

The City should be dismissed because the cause of action fails under *Monell* analysis.  Deputy Chief Bruce otherwise is entitled to qualified immunity against any federal law claims and official immunity against any state law claims.  Thus, the City's and Deputy Chief Bruce's Motion to Dismiss should be granted.

## FACTS

The following facts are gleaned from the Third Amended Complaint and are relied upon solely for purposes of this Motion to Dismiss.  In doing so, the City and Deputy Chief Bruce do not admit the truth or accuracy of these allegations.

All applicable events took place on July 29, 2022.  (Doc. 45, ¶ 17).  A group of approximately 50 people congregated near the GSU Convocation Center (the "Convocation Center") to protest against the construction of the Atlanta Police Training Facility.  (Doc. 45, ¶ 17).  The Convocation Center was under construction and not open to the public, but Plaintiffs Aira and Leckert, with other protesters,

entered the building.  (Doc. 45, ¶¶ 19-20).  Construction workers inside the Convocation Center instructed the protesters that had entered the building to leave. (Doc. 45, ¶ 20).

After the protesters exited the Convocation Center, a GSU officer searched and pursued the protesters and spotted a vehicle containing certain protesters, including Plaintiffs Walter, Maurer, Noyes, and Aira.  (Doc. 45, ¶ 22).  They were immediately detained by the officer.  (Doc. 45, ¶ 22).  Plaintiffs Leckert and Dickhaus were detained a short time later.  (Doc. 45, ¶ 23).  Other law enforcement agencies were requested while the detained protesters were handcuffed and sat on the curb.  (Doc. 45, ¶ 24).

This is where the City and Deputy Chief Bruce are implicated.  According to the Third Amended Complaint, Deputy Chief Bruce arrived at the scene and asked the officers to stretch the charges.  (Doc. 45, ¶ 26).  Deputy Chief Bruce purportedly "urged the GSU Officers to stretch the charges," and stated "anything we can get would help us out tremendously with this group," and that she knew "it's a reach." (Doc. 45, ¶ 26).  Subsequently, the aforementioned construction workers from the Convocation Center identified the detained protesters.  (Doc. 45, ¶¶ 27-28). Eventually, all detained protesters were charged with three crimes: (1) Criminal Damage to Property in the 2nd Degree; (2) Burglary in the 2nd Degree; and (3) Obstruction of Law Enforcement Officer.  (Doc. 45, ¶ 33).  Plaintiffs allege that

4

there was no arguable probable cause to arrest or charge any of the protesters with any crime (Doc. 45, ¶ 37), but Plaintiffs were indicted in the Superior Court of Fulton County on all of these charges. (Doc. 45, ¶ 54). Plaintiffs Walter, Maurer, Noyes, and Aira accepted an offer of pretrial diversion and their criminal cases were later dismissed after they completed the terms of their agreed-to diversion. (Doc. 45, ¶ 54; *see* Doc. 45, ¶ 61). Plaintiffs Leckert and Dickhaus rejected the pretrial diversion offer, and their criminal cases were dismissed on October 24, 2024. (Doc. 45, ¶ 55).

## ARGUMENT AND CITATION OF AUTHORITY

### 1. Motion to Dismiss Standard

Mere conclusory allegations or bare legal conclusions are generally not sufficient to withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. *See Briehl v. General Motors Corp.*, 172 F.3d 623, 627-28 (8th Cir. 1999). In general, a motion to dismiss under 12(b)(6) asserts that even if the well pleaded material allegations of the complaint are true, such allegations are legally insufficient. Such a motion should be granted when it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which can be proved in support of the claim. *See Haines v. Kerner*, 92 S. Ct. 594 (1972).

Where a defendant challenges a complaint for failing to adequately state a claim upon which relief can be granted, the court should apply a "two-pronged approach" in analyzing the complaint. *See Am. Dental Ass'n v. Cigna Corp.*, 605

5

F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). First, the court should "eliminate any allegations in the complaint that are merely legal conclusions." *Id.* This first prong excludes "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Second, the court should assume that all well-pleaded factual allegations are true "and then determine whether [those allegations] plausibly give rise to an entitlement to relief." *Am. Dental Ass'n.*, 605 F.3d at 1290. In determining plausibility, the court should "draw on its experience and common sense." *Iqbal*, 556 U.S. at 664. Moreover, it is proper for the court to infer "'obvious alternative explanation[s]' which suggest lawful conduct rather than the unlawful conduct the plaintiff[s] would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal* and relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Ultimately, if the plaintiff has not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 1289 (quoting *Twombly*, 550 U.S. at 570).

## 2. **Claims Against the City**

### a. *Monell* basics

Municipal liability under § 1983 may not be grounded on a theory of *respondeat superior. Monell v. New York Dept. of Social Services,* 436 U.S. 658 (1978). That said, it is "well established that a municipality may be held liable under

§ 1983 . . . when the deprivation at issue was undertaken pursuant to [municipal] 'custom' or 'policy.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). Municipal liability may be based on, among other things, "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F. 3d 1332, 1343 (11th Cir. 1994). Congruently, a plaintiff may establish a policy or custom exists by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice coupled with deliberate indifference toward same. *Id*. at 1342-43.

To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Praprotnik v. City of St. Louis*, 485 U.S. at 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). In other words, a longstanding and widespread practice is deemed authorized by the final policymaking officials because they must have known about it but failed to stop it. *Brown,* 923 F.2d at 1479-81.

Along with these other principles, a municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls

7

within that authority." *Praprotnik*, 485 U.S. at 127; *see also Mandel v. Doe*, 888 F. 2d 783, 792–93 (11th Cir. 1989).  To impose liability, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom . . . that constituted deliberate indifference to that constitutional right; and (3) that the . . . custom **caused** the violation." *McDowell v. Brown*, 392 F. 3d 1283, 1289 (11th Cir. 2004) (emphasis added); *Brown, supra*, 923 F. 2d 1474, 1479 (11th Cir. 1991).

Also, a failure to train may be the basis for liability under 42 U.S.C. § 1983, but only in "limited circumstances," where there is inadequate training that is a city policy, and that policy causes the violation of a citizen's constitutional rights.  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 389 U.S. 378, 387-91 (1989)).

Since cities rarely have an express policy of inadequately training or supervising its employees, a plaintiff may prove a city policy by showing a "deliberate indifference" to the rights of its citizens. *Gold*, 151 F.3d at 1350.  In other words, the failure to train its employees in a relevant respect must be such a shortcoming that it evidences a policy or custom. *Id.* (quoting *City of Canton*, 489 U.S. at 388-89).

To establish deliberate indifference, a plaintiff "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at

1350. Without notice of a necessity to train, a municipality is not liable as a matter of law. *Id.* at 1351. Additionally, when relying on past complaints, a plaintiff must demonstrate that the complaints had merit. *Id.*

### b. The alleged training inadequacy and policy are unrelated to Plaintiffs' arrests.

At the May 14 hearing, Plaintiffs agreed with the Court that Plaintiffs are alleging the City's informal policy was to find a charge to stop a protest.[1] However, that is not what is in Plaintiffs' Third Amended Complaint (or any other previous complaint), and, therefore, it is not what the City must rebut. *See St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) (internal citations omitted) ("The scope of the review must be limited to the four corners of the complaint."). In fact, some of the past incidents do not even fit into the alleged policy described at the hearing. For example, in *Watchulonis*, the complainant was not arrested and never faced charges. (Doc. 45, ¶ 86). There was no protest. (Doc. 45, ¶ 86). Therefore, the City could not have found or picked a charge to stop a protest, because there were no charges and no protest.

Instead, Plaintiffs identify an alleged training inadequacy and an alleged policy of the City in an effort to establish municipal liability. Those are:

The City has a long history of not adequately training its officers when

---

[1] The City and Deputy Chief Bruce did not request a transcript of the May 14, 2025 hearing. Thus, nothing herein is intended to be an exact quotation of statements made at the hearing.

it comes to protecting and respecting citizens' First Amendment rights which includes violating **citizens' rights to film the police** that ultimately resulted in a contempt order against the City in 2015. (Doc. 45, ¶ 79) (emphasis added).

The City also routinely arrests protesters under the **pretext of violating pedestrian in the roadway laws** . . . . (Doc. 45, ¶ 80) (emphasis added).

The reason these theories are insufficient as a matter of law under *Monell* is obvious – Plaintiffs were not recording an officer at the time of the arrest, nor were they charged with violating pedestrian in the roadway laws. (Doc. 45).

Plaintiffs identify a number of incidents in the Third Amended Complaint that allegedly put the City on notice of the need to train and also that the policy/custom constituted deliberate indifference to a constitutional violation. However, whether or not these past incidents put the City on notice of a need for training or a policy is irrelevant, because the purported need for training and the policy/custom in those cases are different than the allegations here. To illustrate the irrelevancies, the past incidents are summarized below:

- *Baker v. City of Atlanta*. According to the Third Amended Complaint, in *Baker v. City of Atlanta, et al.*, Civil Action No. 1:21-cv-04186-MLB, 19 protesters were **arrested for violating the Pedestrian in the Roadway statute** at the beginning of a protest. (Doc. 45, ¶ 80).

- *May of 2022 Mass Arrest*. Plaintiffs mention another incident, without a reference or citation, wherein there was a "mass arrest" in May 2022 of protesters in Inman Park that were **charged with pedestrian in the roadway violations**. (Doc. 45, ¶¶ 83, 85).

- *Arrests of Melanie Silverstein, Ashley Dixon, and Ryan Michael Seal.*

10

On the same day as the *May of 2022 Mass Arrest,* Silverstein, Dixon, and Seal were allegedly arrested as they were walking home from a protest. (Doc. 45, ¶ 84). According to Plaintiffs, Silverstein and Dixon were allegedly singled out for carrying a "Stop Cop City" sign and **charged with a Pedestrian in the Roadway violation**. (Doc. 45, ¶ 84). According to Plaintiffs, "Mr. Seal was arrested because of his First Amendment protected activities and in retaliation for those activities." (Doc. 26, ¶ 59).

- *Schilling v. Doherty.* This is an allegation arising out of the arrest of Donovan Schilling during 2020 protests for **violating the Pedestrian in the Roadway statute**. *Schilling v. Doherty*, Civil Action No. 1:22-cv-03772-MLB. (Doc. 45, ¶ 81).

- *Watchulonis v. City of Atlanta.* The *Watchulonis* case arose out of a journalist's alleged detainment during his investigation in Intrenchment Creek Park. *Watchulonis v. City of Atlanta*, 1:23-cv-2204-TCB, Northern District of Georgia. He alleges that the officers **interfered with his filming of law enforcement vehicles** in violation of the First Amendment.

  o Plaintiffs seek to incorporate by reference the First Amendment violations referenced in *Watchulonis* to save space. (Doc. 45, ¶ 87). The *Watchulonis* complaint references: (1) a 2009 incident where APD officers allegedly **interfered with a citizens' right to record police activity** (*Calhoun v. City of Atlanta*); (2) another 2009 incident where an arrestee **alleged a false arrest while photographing police activity** (*Anderson v. City of Atlanta*); (3) a 2014 case involving the **alleged arrest of a journalist for disorderly conduct while trying to film police activity during a protest** (*Ruch v. City of Atlanta*); (4) another 2014 case involving the **arrest of a citizen for disorderly conduct while filming police activity during a protest** (*Toole v. City of Atlanta*); (5) a 2020 **arrest of a photo-journalist for a curfew violation while filming police activity** (*Hassan v. City of Atlanta*); and (6) a vague incident involving an unnamed driver for violating the hands-free driving law by **filming officers**. (*Watchulonis v. City of Atlanta*, 1:23-cv-2204-TCB, Doc. 38, pp. 8-9).

- *Gadomski, et al. v. City of Atlanta, et al.* The plaintiffs in *Gadomski* were arrested and **charged with violating Georgia's Pedestrian in the Roadway law** while they were protesting at a City Councilwoman's home. *Gadomski, et al. v. City of Atlanta, et al.*, Civil Action No. 1:23-cv-04036-

VMC. (Doc. 45, ¶ 88).

As shown by the bold language, five of the past incidents – *Baker*; May of 2022 Arrests; Arrests of Silverstein and Dixon; *Schilling*; and *Gadomski* – involve citations / arrests for violating Georgia's Pedestrian in the Roadway law. Other incidents – *Watchulonis, Calhoun, Anderson, Ruch, Toole, Hassan*, and the Unnamed Driver Incident – all involve allegations surround the filming of police activity. Here, Plaintiffs were not charged with a Pedestrian in the Roadway violation and were not filming police activity on the day of the arrests.

The policy and need for training alleged by Plaintiffs must be specific. For *Monell* liability, the standard of proof is high and "intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983." *Gold*, 151 F.3d at 1351 n.10 (11th Cir. 1998) (emphasis added). The specificity requirement applies to the need for training too. Here, the specificities alleged by Plaintiffs are irrelevant to the case at hand. Removing the specificities – Pedestrian in the Roadway violations and filming police activity – there is no municipal liability.

In an opinion in the *Baker* case, this Court stated "[t]hat both the prior incident and this case involve citizens exercising their First Amendment rights is not sufficient to transfer the need for training in one specific area (a citizen's right to film

police) to the need for training in a distinct area (a citizen's right to peacefully protest)." *Baker v. City of Atlanta*, 662 F. Supp. 3d 1308, 1319 (N.D. Ga. 2023). Yet, such improper approach is exactly what Plaintiffs attempt here. Plaintiffs therefore have failed to allege a causal connection between the policy and the need for training and the alleged violations. *See id.*; *McDowell*, 392 F. 3d at 1289.

Put another way, for *Monell* liability, Plaintiffs must show that the cited past incidents are "substantially similar to the case at hand." *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *see also Perez v. Sweetwater*, 770 Fed. Appx. 976, 975-76 (11th Cir. 2019) (finding that past incidents were not 'substantially similar' to the alleged constitutional violation to put the city on notice that additional training was needed). But Plaintiffs' cited past incidents are not substantially similar to their case. Thus, this case absolutely does not fit within the necessary framework to impute *Monell* liability. "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391-92 (1989).

Accordingly, all of Plaintiffs' claims for municipal liability against the City should be dismissed.

13

### 3. Claims against Deputy Chief Bruce

#### a. Qualified Immunity

A government official faced with a civil rights claim brought pursuant to 42 U.S.C. § 1983 is entitled to assert qualified immunity. Qualified immunity generally shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "reflect[s] an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Id.* at 807 (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)).

To establish that qualified immunity applies, a public official defendant must first show that "he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). For qualified immunity purposes, discretionary authority is clear when the official is performing a legitimate job-related function within the power of the law enforcement body. *Mehta v. Foskey*, 877 F. Supp. 2d 1367, 1373 (S.D. Ga 2012). Here, Deputy Chief Bruce was acting in her discretionary authority. According to Plaintiffs, Deputy Chief Bruce had a leadership role in combatting

14

opposition to the police training facility. (Doc. 45, ¶¶ 38, 46). She was allegedly in charge of the Special Enforcement Section of the APD, which had the duty of combatting opposition of and criminal activity related to the training facility. (Doc. 45, ¶ 41).

If the defendant establishes that she was acting within the scope of her discretionary authority, the burden shifts to the plaintiff to rebut the applicability of qualified immunity. First, the plaintiff must show that the public official violated his constitutional rights. Second, the plaintiff must show that the constitutional right was clearly established. *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021). If the plaintiff cannot carry his burden and establish both that a constitutional violation occurred and that the right violated was clearly established, then the defendant is entitled to qualified immunity. *Holloman ex. Rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

For the law to be clearly established, it must be the law at the time of the incident. *Merricks v. Adkisson*, 788 F.3d 553, 559 (11th Cir. 2015). The Court should "compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law. *Id.*

### i. Unlawful Seizure

In Count I, Plaintiffs bring a claim of unlawful seizure for "causing and

15

procuring the arrest and detention of Plaintiffs without arguable probable cause." (Doc. 45, ¶ 68).  The Fourth Amendment protects against unreasonable seizures, including seizures of the person. *California v. Hodari D.*, 499 U.S. 621, 625 (1991). In previous briefing, Plaintiffs clarified their unlawful seizure claim, explaining that the claim arises out of Plaintiffs' detention and arrests prior to the obtaining of warrants. (Doc. 31-1, p. 19).

As an initial matter, there was at least arguable probable cause for the initial seizure. Deputy Chief Bruce is insulated from liability because, even as alleged, probable cause existed to arrest the suspects for trespass. *See Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020).  ("[T]he any-crime rule . . . insulates officers from false arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred.") (emphasis in original).  Paragraph 20 of Plaintiffs' Third Amended Complaint admitted that [s]ome of the protesters entered the building . . . ." (Doc. 45, ¶ 20). Thus, probable cause existed to detain the protesters for trespass.

As to Deputy Chief Bruce, Plaintiffs allege that:

> [Deputy Chief] Bruce caused that seizure by means of using her authority as a high ranking officer of the City of Atlanta Police Department while the GSU Police Officers felt obligated to follow her lead and comply with her urging to fabricate charges against all Plaintiffs given that Atlanta Police Department plays a leading role in the joint task force created to combat the opposition against building of the training center and [Deputy Chief] Bruce is the person in charge within the APD when it comes to Stop Cop City issues.

16

(Doc. 45, ¶ 68).

This long, one-sentence allegation against Deputy Chief Bruce is flawed. It alleges that she "caused" the seizure by her authority as a high ranking officer with the Atlanta Police Department, which plays a leading role in the joint task force to combat these protests. There are no allegations that any GSU officers knew or were aware of Deputy Chief Bruce, much less that their actions were affected by her "authority as a high ranking officer." (Doc. 45, ¶ 68). Likewise, the Third Amended Complaint asserts that while the Atlanta Police Department was a member of the joint task force, the GSU police department was *not*. (Doc. 45, ¶ 39). Thus, there is no plausible explanation or allegation showing why or how the Atlanta Police Department's membership in the joint task force caused GSU officers to detain Plaintiffs.

Moreover, the reasoning behind Plaintiffs' argument that Deputy Chief Bruce "caused" the detention is that GSU officers "felt obligated to follow her lead and comply with her urging to fabricate charges." (Doc. 45, ¶ 68). However, the sequence of events renders this argument implausible. Plaintiffs allege that Deputy Chief Bruce's urges to GSU officers occurred *after* Plaintiffs were already detained. If they were already detained at the time of Deputy Chief Bruce's statements, it is impossible for statements to "cause" the detainment.

The Third Amended Complaint is abundantly clear that "the detention [was]

17

initiated by Defendant Patton," *not* Deputy Chief Bruce. (Doc. 45, ¶ 27). This is in line with previous contentions by Plaintiffs, whereby they stated "Defendant Patton pursued and detained the Plaintiffs, and then Deputy Chief Bruce came on the scene asking to fabricate charges." (Doc. 31-1, p. 20). The Third Amended Consolidated Complaint states that Deputy Chief Bruce arrived at the scene *after* Plaintiffs were already detained and handcuffed. (Doc. 26, ¶¶ 24, 26).

There is no case law suggesting that an officer can be liable for unlawful seizure when she did not participate in the initial or continuing seizure. In other words, Plaintiffs have not pointed to case law suggesting that a law enforcement officer can be liable for unlawful seizure for urging other officers (from a different agency) to stretch the charges against the already-detained suspects.

Deputy Chief Bruce is entitled to qualified immunity as there was probable cause for the initial seizure and she violated no clearly established law.

### ii. Malicious Prosecution

The Eleventh Circuit has stated "that, for purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution included: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused. *Id.* at 881-82.

18

Regarding the elements above, Deputy Chief Bruce did not institute or continue a criminal prosecution. She did not detain Plaintiffs (Doc. 45, ¶¶ 22-23, 26); she did not write Plaintiffs citations (Doc. 45, ¶ 33); she did not swear out the warrants (Doc. 45, ¶ 33); she did not arrest Plaintiffs. (Doc. 45, ¶ 35). All she allegedly did was persuade the GSU officers to stretch the charges. Plaintiffs assert that Deputy Chief Bruce is liable "because her persuasion was the determining factor in inducing the charging decisions." (Doc. 45, ¶ 72). However, there is no case law, meaning there was no clearly established law, showing that a law enforcement can be held liable for "inducing" the charges through persuasion.

The Third Amended Complaint makes clear that Deputy Chief Bruce did not observe Plaintiffs' conduct that led to their arrests. Thus, she did not lie to the GSU officers or misinform them of the underlying facts. Even the quotations attributed to Deputy Chief Bruce do not show any wrongdoing – she simply requested that the GSU officers fully charge Plaintiffs for their wrongful conduct.

There was no clearly established law showing that an officer with could be liable for malicious prosecuting by simply requesting other law enforcement officers (from a different agency) fully charge suspects, especially when the officer had not observed the suspects' conduct and therefore portrayed no facts at all. Deputy Chief Bruce is entitled to qualified immunity.

### iii. First Amendment Retaliation

19

A First Amendment Retaliation claim must be supported by the showing of three elements: "(1) she engaged in constitutionally protected speech . . . ; (2) the defendant's retaliatory conduct adversely affected that protected speech . . . ; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech . . . ." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). "[A] defendant adversely affects protected speech if his alleged retaliatory conduct 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Bailey v. Wheeler*, 843 F.3d 473 (11th Cir. 2016) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)).

The quotes in the Third Amended Complaint attributed to Deputy Chief Bruce would not "deter a person of ordinary firmness" from participating in a similar protest in the future. She allegedly urged the GSU officers to stretch the charges, stating that "anything we can get would help us out tremendously with this group" and "I know it's a reach." (Doc. 45, ¶ 26). Deputy Chief Bruce's alleged comments do not even show wrongdoing. Her requests to the officers to maximally charge the violators was done to enforce the law. In fact, Deputy Chief Bruce did not even write citations or swear out the arrest warrants. (Doc. 45, ¶ 33).

The arguments raised in the foregoing sections regarding qualified immunity for Plaintiffs' unlawful seizure and malicious prosecution claims are applicable here.

20

Therefore, those arguments are reincorporated and reiterated as if set forth fully herein. Thus, Deputy Chief Bruce is entitled to qualified immunity.

### b. Official Immunity

Plaintiffs Leckert and Dickhaus bring a state law malicious prosecution claim against Deputy Chief Bruce. (Doc. 45, ¶ 91).

Official immunity, which exists by virtue of Article I, § 2, ¶ IX of the Georgia Constitution, generally provides county, state, and public officers with immunity from certain state law claims that may be brought against them. More particularly, if a state law claim arises while the official is performing a discretionary function, then the official is immune from suit therefor unless the plaintiff can show that the official performed the discretionary act with malice or an intent to injure. *Gilbert v. Richardson*, 264 Ga. 744, 753 (1994); *Morgan v. Barnes*, 221 Ga. App. 653 (1996). In distinguishing between discretionary and ministerial acts, the Georgia Court of Appeals has instructed that "[a] discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Teston v. Collins*, 217 Ga. App. 829, 830 (1995).

Here, there is no doubt that Deputy Chief Bruce was performing discretionary functions at the time of the incident at issue in this case. The allegations in the Third Amended Complaint show that she assessed and/or investigated Plaintiffs' conduct

and acted on them through her statements to GSU officers. Furthermore, she is alleged to routinely report back to Chief Schierbaum as to the progress of activities related to opposition to the police training facility. (Doc. 45, ¶ 43).

Thus, the question is whether Deputy Chief Bruce's alleged actions were done maliciously. Although malice is an element of malicious prosecution, it is different than the *actual* malice requirement to overcome official immunity. *Marshall v. Browning*, 310 Ga. App. 64, 73-74 (2011). For official immunity, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others." *Selvy v. Morrison*, 292 Ga. App. 702, 704 (2008).

Again, the City and Deputy Chief Bruce look at the exact allegations attributed to Deputy Chief Bruce. According to Plaintiffs, Deputy Chief Bruce "urged the GSU Officers to stretch the charges," stated that "'anything we can get would help us out tremendously with this group,'" and stated that she knew "'it's a reach.'" (Doc. 45, ¶ 26). For these accusations to show wrongdoing, it would require the Court to make an inference. "[B]ut an inference of malice is insufficient to overcome [an official] immunity defense." *Watkins v. Latif*, 323 Ga. App. 306, 311 (2013). The allegations are woefully insufficient to show there Deputy Chief Bruce "intended to do wrong." *Marshall*, 310 Ga. App. at 69.

**c. Plaintiffs Walter's, Maurer's, Noyes' and Aira's Underlying Criminal Cases Were Not Favorably Terminated.**

22

An essential element to malicious prosecution and First Amendment retaliation claims is termination of the underlying criminal proceeding in favor of the accused. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (federal law malicious prosecution); *Hall v. Merola*, 67 F.4th 1282, 1295 (11th Cir. 2023) (First Amendment retaliation claim for instigating a disciplinary action).

The type of pretrial diversion agreement entered into here is not a favorable termination for these Plaintiffs.

> Although proof of actual innocence is not required for proof of a favorable termination for purposes of a malicious prosecution claim, the prosecution's dismissal of charges in a host of circumstances will not be considered a termination in favor of the Defendant, i.e., in circumstances reflecting compromise agreements for withdrawal of charges and pretrial diversion agreements, or dismissals where the existence of probable cause has been demonstrated. *Wood v. Kessler*, 323 F.3d 872, 882 (11th Cir. 1998); *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir. 1998) (abrogated on other grounds). But Courts have, on the other hand, found a "favorable termination" where a prosecution has been terminated as a result of acquittal or "an order of dismissal reflecting an affirmative decision not to prosecute" or a "dismissal based on the running of the statute of limitations" or in some circumstances, a Nolle Prosequi which is not the result of some form of compromise. *Uboh*, 141 F.3d at 1004.

*Davis v. Stubbins*, 2020 WL 13891312, at *12 (N.D. Ga. May 22, 2020)

A negotiated dismissal for entering pretrial diversion is not a "favorable termination." In previous briefings, Plaintiffs cite to *Thompson* and *Laskar,* arguing that an ending to a criminal prosecution without a conviction is sufficient to satisfy the "favorable termination" element for malicious prosecution claims. (Doc. 31-1,

23

p. 18).   Specifically, the *Thompson* opinion states that, to satisfy the favorable termination element, "[a] plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022).  The facts in *Thompson* are much different than here – "the charges were dismissed before trial without any explanation by the prosecutor or judge."  *Id*. at 39.   In *Laskar*, the Eleventh Circuit held that "the favorable-termination element requires only that the criminal proceedings against the plaintiff formally end in a manner not inconsistent with his innocence on at least one charge that authorized his confinement." *Laskar v. Hurd*, 972 F.3d 1278, 1295 (11th Cir. 2020).  However, a dismissal in exchange for pretrial diversion would be inconsistent with the person's innocence.

The pretrial diversion program here is exactly the type of compromised agreement that precludes a finding of a favorable termination.  At the hearing in this matter, the Court desired additional facts regarding the pretrial diversion program entered into by four of the Plaintiffs.  Plaintiffs' Third Amended Complaint provides said facts.  A dismissal after completion of the pretrial program is not unconditional – it is a compromised agreement.  There was an offer and an acceptance.  (Doc. 45, ¶¶ 54, 60).  Dismissal was contingent upon completion of the program.  (Doc. 45, ¶ 63).  This is much different than a dismissal "without any explanation." *Thompson*, 596 U.S. at 39. As such, the malicious prosecution and First Amendment retaliation claims against Deputy Chief Bruce should be dismissed as to Plaintiffs' Walter,

24

Maurer, Noyes, and Aira.

## 4. Conspiracy Against the City and Deputy Chief Bruce.

Plaintiffs bring a cause of action for conspiracy to violate her constitutional rights against all of the defendants under 42 U.S.C. § 1983. (Doc. 26, p. 35). "A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right. The plaintiff attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights. The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). Here, the factual allegations do not support the conclusion that Deputy Chief Bruce reached an understanding with others to deny Plaintiffs their rights. But even if they did, this claim still fails because there can be no civil liability where there is no underlying constitutional violation against Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims with prejudice against the City of Atlanta and Deputy Chief Jessica Bruce.

Respectfully submitted this 17th day of June, 2025.

25

| | **HALL BOOTH SMITH, P.C.** |
|---|---|
| 191 Peachtree Street, N.E.<br>Suite 2900<br>Atlanta, GA 30303-1775<br>Tel: (404) 954-5000<br>Fax: (404) 954-5020<br>rbritt@hallboothsmith.com<br>nkinsley@hallboothsmith.com | */s/ Russell A. Britt*<br>*/s/ Nicholas A. Kinsley*<br>RUSSELL A. BRITT<br>Georgia Bar No. 473664<br>NICHOLAS A. KINSLEY<br>Georgia Bar No. 273862<br><br>*Counsel for Defendants City of Atlanta and Major Jessica Bruce* |

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

Pursuant to Local Rule 7.1D for the Northern District of Georgia, the undersigned counsel for Defendant City of Atlanta and Deputy Chief Bruce certifies that the above and foregoing is a computer document prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1B and C.

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SOPHIA AIRA, et al.

         Plaintiff,

      v.

CITY OF ATLANTA, et al.

         Defendants.

CIVIL ACTION FILE NO.
1:24-cv-03344-MHC

## CERTIFICATE OF SERVICE

I hereby certify that on this day I have electronically filed the foregoing **CITY OF ATLANTA'S AND MAJOR JESSICA BRUCE'S BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES** with the Court using the CM/ECF System and served a copy via the e-filing system, which will automatically serve all parties to this matter:

**Drago Cepar, Jr., Esq.**
1900 The Exchange, Suite 490
Atlanta, GA 30339
770-940-3233
dcepar@gmail.com
*Counsel for Plaintiff*

**Wade W. Herring, III**
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Tel: (404) 458-3375
wherring@law.ga.gov

This 17th day of June, 2025.

28

|  |  |
| --- | --- |
| 191 Peachtree Street, N.E.<br>Suite 2900<br>Atlanta, GA 30303-1775<br>Tel: (404) 954-5000<br>Fax: (404) 954-5020<br>rbritt@hallboothsmith.com<br>nkinsley@hallboothsmith.com | **HALL BOOTH SMITH, P.C.**<br><br>/s/ Russell A. Britt<br>/s/ Nicholas A. Kinsley<br>RUSSELL A. BRITT<br>Georgia Bar No. 473664<br>NICHOLAS A. KINSLEY<br>Georgia Bar No. 273862<br><br>Counsel for Defendants City of Atlanta and Major Jessica Bruce |