IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SOPHIA AIRA, *et al.*,

    Plaintiffs,

      v.

CITY OF ATLANTA, *et al.*,

    Defendants.

CIVIL ACTION NO.
1:24-cv-03344-TRJ

## ORDER

On June 17, 2025, Defendants City of Atlanta and Major Jessica Bruce[1] filed a motion to dismiss Plaintiffs' third consolidated amended complaint. (Doc. 48). Upon review and consideration, Defendants' motion to dismiss is **GRANTED IN PART and DENIED IN PART**. Defendants' motion for judicial notice (Doc. 52) is **GRANTED**.

## BACKGROUND

On July 29, 2022, approximately 50 people arrived near the Georgia State University Convocation Center to protest against the construction of the Atlanta Police Training Facility known as "Cop City." (Doc. 45 at ¶ 17). Plaintiffs Sophia Aira, Gina Dickhaus, Laurel Leckert, Gillian Maurer, Melanie Noyes, and Abby Walter were a part of this group. (*Id.* at ¶ 20). The protestors walked towards the Convocation Center building, which was not open to the public at the time, chanting and clapping. (*Id.* at ¶ 19). There were no posted signs regarding trespass on the property. (*Id.* at ¶ 37). Some of the protesters entered the building chanting and clapping, and they remained inside for two to three minutes. (*Id.* at ¶ 20). While inside, construction workers asked the

---

[1] After this action was filed, Bruce's title changed to Deputy Chief. (Doc. 45 at ¶ 82).

protestors to leave the building, and they complied. (*Id.*) Dickhaus, Maurer, Noyes, and Walter allege they were not among the protesters that entered the building. (*Id.*)

After exiting the building, the protestors encountered Georgia State University ("GSU") Police Department officers, including Defendant Anthony Ewing. (*Id.* at ¶ 21). Officer Ewing told the protestors to "get out of here" and did not stop the protestors as they left the area. (*Id.* at ¶¶ 21, 36). The protestors immediately complied with Officer Ewing's request. (*Id.* at ¶ 37). Shortly thereafter, Defendant John Patton, another GSU officer, searched for the protestors and found a parked vehicle approximately half a mile from the Convocation Center. (*Id.* at ¶¶ 5, 22). Plaintiffs Maurer, Noyes, Walter, and Aira were inside the vehicle. (*Id.* at ¶ 22). Officer Patton, with the help of another GSU Officer, Defendant Sidney Smith, immediately detained them. (*Id.*) Raymond Surya, Leckert, and Dickhaus were also detained nearby at Officer Patton's direction. (*Id.* at ¶ 23). All of the Plaintiffs were handcuffed and forced to sit on the curb in the hot sun for several hours while other law enforcement agencies, including the City of Atlanta Police Department ("APD"), arrived on the scene and investigated. (*Id.* at ¶ 24).

APD Major Jessica Bruce was one such officer at the scene. (*Id.* at ¶¶ 7, 26). When she arrived, Major Bruce "urged the GSU [o]fficers," including Officer James Fraser, "to stretch the charges against [the] detained individuals to help the City fight the opponents of 'Cop City.'" (*Id.* at ¶ 26). After one GSU officer stated that the protestors' conduct was "not really chargeable," Major Bruce stated that "anything we can get would help us out tremendously with this group," and "I know it's a reach." (*Id.*) Officer Fraser, who was recording the interaction on his body camera, turned off the camera at that time "to conceal the remainder of the conversation." (*Id.* at ¶¶ 26, 50). Major Bruce also stated to

Officer Fraser that they were "getting some of our people." (*Id.* at ¶ 49).

At the time of the protest, Major Bruce was a part of an interagency joint task force assembled in 2022 to respond to the opposition to Cop City and crime around the site. (*Id.* at ¶ 38). As part of her role on the task force, Major Bruce routinely made site visits to protests against Cop City and led the Special Enforcement Section of the group from March 2022 to February 2024. (*Id.* at ¶¶ 38, 43). APD, the Georgia Bureau of Investigation, Georgia State Patrol, and the Federal Bureau of Investigation, among other organizations, all participated in the task force at some point. (*Id.*) APD assumed a leadership role over the task force while other agencies assisted. (*Id.* at ¶¶ 40, 42).

As leader of the Special Enforcement Section, Major Bruce oversaw the units directly responsible for combating Cop City opposition and routinely reported on the progress of those activities to APD Chief Schierbaum. (*Id.* at ¶ 43). Major Bruce once provided an update regarding operations at Cop City to Atlanta Mayor Andre Dickens. (*Id.* at ¶ 44). Major Bruce's Special Enforcement Section included the Homeland Security Unit, which monitored social media posts related to the City of Atlanta's public safety training facility. (*Id.* at ¶ 43). On the day of the protest at issue, GSU officers were informed that Homeland Security was on its way to the scene. (*Id.* at ¶ 47). After detaining the protestors, GSU Officer Jamar Reed asked two workers from the construction site to come to the site to identify the protestors. (*Id.* at ¶¶ 4, 27). Officer Reed told the workers that officers caught the individuals who went inside the Convocation Center, but they needed the workers to act as witnesses. (*Id.* at ¶ 27). Officer Reed drove the workers to the detained individuals sitting on the curb, stopped his vehicle approximately 50 feet away, and asked the workers to identify the protestors from

3

inside of his police vehicle. (*Id.* at ¶ 28). The workers never indicated that the protestors damaged any property in the Convocation Center. (*Id.* at ¶ 30). The officers (and all of the named Defendants) knew that the protestors entered the building to protest and not to commit a felony. (*Id.* at ¶ 31).

Hours later, officers arrested the protestors and charged them with (1) criminal damage to property in the second degree – felony (O.C.G.A. § 16-7-23), (2) burglary in the second degree – felony (O.C.G.A. § 16-7-1(c)), and (3) obstruction of law enforcement officer – misdemeanor (O.C.G.A. § 16-10-24). (Doc. 45 at ¶¶ 33, 52). Officer Ewing wrote citations for Plaintiffs and swore warrants for their arrests for the listed charges. (*Id.*) Plaintiffs allege that Officer Ewing "knew that the information presented to the magistrate to obtain warrants was false or should have known that it was false," and that he conspired with the other Defendants to arrest and charge the protestors. (*Id.* at ¶¶ 34–35). Plaintiffs were indicted in the Superior Court of Fulton County by a grand jury. (*Id.* at ¶ 54).

Each Plaintiff, except for Leckert and Dickhaus, completed a pretrial diversion program and had their cases dismissed. (*Id.*) Leckert and Dickhaus filed a motion to suppress the show-up identification by the construction workers, which was granted and led to the dismissal of their cases on October 24, 2024. (*Id.*) In the order granting the motion to suppress, the Superior Court determined that it had "little trouble concluding that Officer Reed's multiple comments to the witnesses on the way to the show-up identification crossed the line and were impermissibly suggestive." (*Id.* at ¶ 58). The Superior Court also concluded that "the showup here was a textbook example of what not to do[.]" (*Id.*)

All of the other Plaintiffs agreed to pretrial diversion. (*Id.* at ¶ 60). According to the adult diversion director for Fulton County's program, diversion program participants are not required to admit guilt while in the program. (*Id.*) Rather, the case against the pretrial diversion participant is placed on judicial hold and eventually dismissed with a restricted record once the participant completes the program. (*Id.* at ¶ 61). The Plaintiffs that participated in the program entered *nolle prosequi* pleas, and their records were restricted from public access. (*Id.* at ¶ 62).

On May 20, 2025, Plaintiffs filed a third consolidated amended complaint alleging the following claims:

- Unlawful seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983 against all Defendants, except the City;

- Malicious prosecution in violation of the Fourth Amendment under 42 U.S.C. § 1983 against all Defendants, except the City;

- Municipal liability against the City;

- Malicious prosecution, brought only on behalf of Plaintiffs Leckert and Dickhaus, under O.C.G.A. § 51-7-40 against all Defendants, except the City;

- Retaliation in violation of the First Amendment under 42 U.S.C. § 1983 against all Defendants, except the City; and

- Conspiracy to violate constitutional rights under 42 U.S.C. § 1983 against all Defendants.

(Doc. 45 at ¶¶ 67–107). On June 17, 2025, the City and Major Bruce moved to dismiss the claims against them. (Doc. 48).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); FED. R. CIV. P. 12(b)(6). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a claim will survive a motion to dismiss if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, at the motion to dismiss stage, "all well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted). Courts are not required, however, to accept as true legal conclusions "couched" as factual allegations. *Twombly*, 550 U.S. at 555 (citation omitted).

DISCUSSION

In their motion to dismiss, the City and Major Bruce mount various defenses based on the claims against them. (*See* Doc. 48-1). First, the City argues it cannot be held liable under *Monell* because Plaintiffs fail to allege it was on notice of the need to train its officers. (*Id.* at 9). Second, Major Bruce argues that the claims against her are barred by qualified and official immunity. (*Id.* at 14–25). Third, the City and Major Bruce seek to dismiss the conspiracy claim against them since "the factual allegations do not support the conclusion [the City and Major Bruce] reached an understanding with others to deny Plaintiffs their rights." (*Id.* at 25).

### A. *Monell* Claim Against the City

Under 42 U.S.C. § 1983, every person who subjects any U.S. citizen "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

6

proceeding for redress[.]" Local governments are "persons" for purposes of § 1983, but the Supreme Court "has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003); *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). A plaintiff cannot rely upon the theory of *respondeat superior* in establishing a § 1983 claim against a municipality. *Grech*, 335 F.3d at 1329. Rather, to impose § 1983 liability on a municipality, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Grochowski v. Clayton Cnty., Ga.*, 961 F.3d 1311, 1321 (11th Cir. 2020) (citation modified); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). This "deliberate conduct" must be the "moving force" behind the injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989).

To demonstrate a "custom or policy" for § 1983 purposes, a plaintiff may rely on "(1) an official government policy, (2) the actions of an official fairly deemed to represent government policy, or (3) a custom or practice so pervasive and well-settled that it assumes the force of law." *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (citation modified); *McDowell*, 392 F.3d at 1290. "[A]n official government policy may also be 'a municipality's decision not to train employees on their legal duty not to violate citizens' rights.'" *Dixon v. City of Atlanta,* No. 1:24-cv-02061-JPB, 2024 WL 5131769, at *2 (N.D. Ga. Dec. 16, 2024) (quoting *Sosa v. Martin Cnty.,*

*Fla.*, 13 F.4th 1254, 1277 (11th Cir. 2021)); *see also Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009).

In the third consolidated amended complaint, Plaintiffs allege that the City is subject to *Monell* liability under failure to train and final policymaker theories. (Doc. 45 at ¶ 87). The City argues that the *Monell* claim fails under both theories because Plaintiffs did not identify a City policy or custom that led to Plaintiffs' purported harm. (Doc. 48-1 at 10).

### 1. Failure to Train

Plaintiffs allege that the City has an unofficial policy of failing to train its officers on First Amendment protections of individuals protesting at Cop City. (Doc. 45 at ¶ 87). "Municipal policy or custom may include a failure to provide adequate training if the deficiency evidences a deliberate indifference to the rights of its inhabitants. To [show] a city's deliberate indifference, a plaintiff must [allege] that the municipality knew of a need to train and/or supervise in a particular area and . . . made a deliberate choice not to take any action." *Lewis*, 561 F.3d at 1293 (citation modified); *see also Dixon*, 2024 WL 5131769, at *2. "This notice requirement may be satisfied by alleging a pattern of similar constitutional violations by untrained employees." *Dixon*, 2024 WL 5131769, at *2 (citation omitted).

In the third consolidated amended complaint, Plaintiffs cite to several prior instances of alleged "deliberate indifference by the City as to the need to properly train officers on First Amendment protections." (Doc. 45 at ¶¶ 79–88) (citing *Baker v. City of Atlanta*, No. 1:21-cv-04186-MLB (protestors arrested under pretext of violating pedestrian in roadway laws at direction the City's high ranking officer); *Schilling v.*

*Doherty*, No. 1:22-cv-03772-MLB (protestors arrested for pedestrian law violations after lieutenant for the City "was pointing out to other officers individuals from the crowd that he wanted arrested by stating: 'This one needs to go, this one needs to go!'"); *Watchulonis v. City of Atlanta*, No. 1:23-cv-02204-TCB (reporter threatened with arrest by a City officer for filming at a protest); *Gadomski v. City of Atlanta*, No. 1:23-cv-04036-TWT (protestors arrested under pretext of violating pedestrian in roadway laws by the City's officers at a Cop City protest)). According to Plaintiffs, "[t]here are numerous other instances of similar pretextual arrests of protesters . . . that further discovery will reveal." (*Id.* at ¶ 81).

In its motion to dismiss, the City argues that these cases insufficiently allege it had notice of a need to train officers. (Doc. 48-1 at 9). Specifically, the City argues that, unlike the plaintiffs in the cited cases, Plaintiffs here "were not recording an officer at the arrest, nor were they charged with violating the roadway laws." (Doc. 48-1 at 10). In support of its argument, the City cites *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) and *Perez v. City of Sweetwater*, 770 F. App'x 967, 972 (11th Cir. 2019) for the proposition that, for *Monell* liability to arise, past incidents must be "substantially similar to the case at hand." (Doc. 48-1 at 13). Both *Mercado* and *Perez*, however, were decided after discovery; the Eleventh Circuit held that the *Mercado* and *Perez* plaintiffs could not demonstrate sufficient similarity of prior incidents based on *evidence* presented at summary judgment and a jury trial. *Mercado*, 407 F3d at 1162 ("During discovery, [the plaintiff] was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are substantially similar to the case at hand."); *Perez*, 770 F. App'x at 975–76 (granting judgment notwithstanding the jury

9

verdict because evidence at trial "could not have put the City on actual or constructive notice that its police officers required additional training or supervision in the 'particular areas'" at issue). At the motion to dismiss stage, a plaintiff need "only show that the defendant had notice by alleging a pattern of similar constitutional violations." *Dixon*, 2024 WL 5131769, at *3.

Here, Plaintiffs allege prior instances where the City was sued for violating the First Amendment rights of protestors as it was here. (Doc. 45 at ¶¶ 70–88). And although one of those lawsuits involved threat of arrest, it still involved alleged First Amendment violations of protestors. *Watchulonis v. City of Atlanta*, No. 1:23-cv-02204-TCB (reporter sued the City after being threatened with arrest for filming at a protest). In any event, having identified several instances of purported pretextual arrests in violation of the First Amendment, as Plaintiffs did here, is sufficient at this stage. *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016) (concluding that "one or two incidents . . . is generally insufficient to indicate a pattern," but on a motion to dismiss, "allegations of anything more than that are generally sufficient"); *Dixon*, 2024 WL 5131769, at *3 ("By referencing [three] other instances where protestors have been arrested, [a plaintiff] has done enough to allege a pattern of similar constitutional violations by untrained employees."). Indeed, Plaintiffs allege two of the cited cases involved other Cop City protestors. (Doc. 45 at ¶¶ 80, 88) *Gadomski*, No. 1:23-cv-04036-TWT (alleging pretextual arrests at a Cop City protest); *Baker*, No. 1:21-cv-04186-MLB (same). As such, Plaintiffs have met their burden to plausibly allege similar constitutional violations to withstand a Rule 12(b)(6) motion. *See Williams*, 181 F. Supp. 3d at 1122; *Dixon*, 2024 WL 5131769, at *3.

10

### 2. Final Policymaker

In addition to their failure to train theory, Plaintiffs also allege that the City is liable under a final policymaker theory. (Doc. 45 at ¶¶ 43–45, 89). Specifically, Plaintiffs allege that APD Chief Schierbaum or Mayor Dickens "had knowledge of [Major] Bruce's actions on the day in question . . . or at minimum ratified [her] actions after the fact." (*Id.* at ¶ 45). "[A] a lesser official's decision may also subject a municipality to liability [by] ratification." *Dixon*, 2024 WL 5131769, at *3. Ratification occurs "when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016).

The City does not address whether the final policymaker theory of *Monell* liability was plausibly alleged by Plaintiffs. *See* LR 7.1(B) ("Failure to file a response shall indicate that there is no opposition."). The City did, however, file an unopposed motion for judicial notice of Atlanta City Code of Ordinances § 98-26 and APD.SOP.1010[2] (Atlanta Police Department Standard Operating Procedure) to indicate that the City's Chief of Police is a final policymaker for APD. (Doc. 52 at 2–3). While the Court will take judicial notice of Atlanta City Code of Ordinances § 98-26 and APD.SOP.1010, these

---

[2] Because the content of these ordinances and policies "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," the Court can take judicial notice of these records. *See* FED. R. OF EVID. 201 (requiring courts to "take judicial notice if a party requests it and the court is supplied with the necessary information"). Under Atlanta City Code of Ordinances § 98-26, "[i]t shall be the duty of the police chief to formulate and implement rules and regulations for the operations of the department of police." (Doc. 52-1 at 1). And under APD.SOP.1010(4.2), the Chief of Police is the Chief Executive Officer of APD and, as such, has "the authority and responsibility to manage, direct, and control the operations and administration of [APD]." (Doc. 52-2 at 3).

11

policies alone achieve very little to defeat Plaintiffs' final policymaker theory. "[I]dentifying and proving that a final policymaker acted on behalf of a municipality is an evidentiary standard, and not a pleading requirement." *Hoefling*, 811 F.3d at 1280 (citation modified). Plaintiffs have plausibly alleged that Major Bruce reported to the APD Chief and the Mayor regarding her management of the Cop City protests, and that those officials ratified her choices. Accordingly, Plaintiffs' claim for *Monell* liability under the final policymaker theory may proceed. *Dixon*, 2024 WL 5131769, at *3. Therefore, the City's motion to dismiss Plaintiffs' *Monell* claims against it is **DENIED**.

### B. Claims Against Major Bruce

Major Bruce moves to dismiss each of the claims against her: (1) unlawful seizure in violation of the Fourth Amendment under § 1983, (2) malicious prosecution in violation of the Fourth Amendment under § 1983, (3) malicious prosecution under O.C.G.A. § 51-7-40 (by Plaintiffs Leckert and Dickhaus only), (4) First Amendment retaliation under § 1983, and (5) conspiracy to violate constitutional rights. (Doc. 45 at ¶¶ 67–76, 90–107). Major Bruce argues that the § 1983 claims are barred by qualified immunity, and that the state-law malicious prosecution claim is barred by official immunity. (Doc. 48-1 at 14–25). In their response, Plaintiffs maintain that their claims are sufficiently pleaded, and that no immunity defenses apply. (Doc. 50).

#### 1. Qualified Immunity

"Qualified immunity shields a government official from liability unless he violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 951 (11th Cir. 2019) (citation modified); *Alcocer v. Mills*, 906 F.3d 944, 950–51 (11th Cir. 2018). Once a government

12

official demonstrates that his actions were within his discretionary authority, the burden shifts to the plaintiff to demonstrate that the official "violated clearly established constitutional law" and is not entitled to qualified immunity. *Jordan v. Doe*, 38 F.3d 1559, 1565–66 (11th Cir. 1994) (citation omitted); *Lewis*, 561 F.3d at 1291. A government official is acting within his discretionary authority when "[the] actions were undertaken pursuant to the performance of his duties and were within the scope of his authority." *Jordan*, 38 F.3d at 1566 (citation omitted). Notably, "questions of qualified immunity must be resolved at the earliest possible stage in litigation." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) ("It is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage [if the plaintiff] fails to allege the violation of a clearly established constitutional right." (citation modified)).

It is undisputed that Major Bruce was acting within the scope of her discretionary authority at the time of the alleged constitutional violations. Thus, the burden shifts back to Plaintiffs to show Major Bruce is not entitled to qualified immunity. *Jordan*, 38 F.3d at 1566; *Gonzalez*, 325 F.3d at 1234. To do so, Plaintiffs must show that (1) she "violated a constitutional right," and (2) "the right was clearly established at the time of the alleged violation." *Piazza*, 923 F.3d at 951. Courts "need not conduct this qualified immunity analysis in any specific order; rather, [courts] are permitted to exercise [their] sound discretion in deciding which prong of this inquiry to address first." *Maughon v. City of Covington*, 505 F. App'x 818, 821 (11th Cir. 2013).

### a.   *Constitutional Violations*

The Court first turns to whether the factual allegations in the third consolidated amended complaint plausibly allege that Major Bruce violated a constitutional right. *See*

*id.* Plaintiffs allege that Major Bruce violated their Fourth Amendment rights (unlawful seizure and malicious prosecution) and their First Amendment right to be free from retaliation. (Doc. 48-1 at 15–21).

First, Plaintiffs adequately allege a Fourth Amendment violation based on an unlawful seizure. The Fourth Amendment protects against "unreasonable . . . seizures." U.S. CONST. amend. IV; *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (citation omitted). "[P]robable cause exists whenever an officer reasonably believes that an offense is being committed"—this is not a high bar to prove. *Durruthy v. Pastor*, 351 F.3d 1080, 1090 (11th Cir. 2003); *Scott v. City of Miami*, 139 F.4th 1267, 1273 (11th Cir. 2025) (citation omitted). "Even without actual probable cause, . . . a police officer is entitled to qualified immunity if he had only arguable probable cause to arrest the plaintiff." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Id.*; *see also Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) ("[A]rguable probable cause to arrest for some offense must exist in order for officers to assert qualified immunity from suit.").

Plaintiffs allege that the officers "had no arguable probable cause to arrest them for any crime." (Doc. 45 at ¶¶ 32, 36, 72 92–93, 103). Major Bruce argues that she "is insulated from liability because, even as alleged, probable cause existed to arrest the suspects for trespass" under the any-crime rule. (Doc. 48-1 at 16). "[T]he any-crime rule

14

. . . insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Because Plaintiffs entered the Convocation Center, Major Bruce argues there was at least arguable probable cause for trespass. (Doc. 48-1 at 16; Doc. 45 at ¶ 37).

But, even under the any-crime rule, Plaintiffs' allegations preclude a finding of arguable probable for trespass. "Whether an officer has probable cause or arguable probable cause, or neither, depends on the elements of the alleged crime and the operative fact pattern." *Gates,* 884 F.3d at 1298 (citation modified). Under Georgia law, one commits criminal trespass if he "knowingly and without authority . . . [e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice . . . that such entry is forbidden." O.C.G.A. § 16-7-21(b)(2). Here, Plaintiffs allege that "at the time of their entry there were no posted signs[,] and they have not received a criminal trespass warning by an owner or an authorized person." (Doc. 45 at ¶ 37). And when Officer Ewing instructed them to leave, they "immediately complied." (*Id.*) Viewing the facts in the light most favorable to Plaintiffs, as the Court must do at the motion to dismiss stage, the allegations indicate a lack of arguable probable cause for criminal trespass. *See Baker v. City of Atlanta*, 662. F. Supp. 3d 1308, 1322 (N.D. Ga. 2023) ("The facts allege the lack of probable cause or even arguable probable cause for Plaintiffs' arrest, and thus allege a violation of Plaintiffs' Fourth Amendment rights."). Plaintiffs have also plausibly alleged that the officers lacked actual probable cause to arrest them for the crimes charged: criminal damage to property, burglary, and misdemeanor obstruction. (Doc. 54 at ¶¶ 30, 32 (no property damage to the Convocation Center); ¶ 31

15

(officers knew the protestors had no intention to commit a felony or theft inside the building); and ¶ 21 (protestors followed officers' order to leave).

Additionally, Major Bruce's argument that she cannot be held liable for the seizure since she did not "cause" the seizure is unpersuasive at this stage. The Eleventh Circuit provides that a plaintiff may establish § 1983 liability by alleging "that the official was personally involved in the acts that resulted in the constitutional deprivation." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010). Though being present at the scene, alone, is not enough, alleging "that the defendant officer was part of the chain of command authorizing the arrest action" is sufficient. *Id.* Because Plaintiffs allege that Major Bruce, in her "leadership role," instructed officers to charge protestors, knowing and articulating that it was "a reach," they have plausibly alleged that she was personally involved in the constitutional deprivation for § 1983 purposes. (Doc. 45 at ¶¶ 26, 46).

Second, Plaintiffs plausibly state a claim for malicious prosecution. "For purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution include: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Chancy v. Bruno*, 679 F. App'x 864, 867 (11th Cir. 2017) (citation modified). Plaintiffs have alleged each of these elements—Plaintiffs faced prosecutions instituted, in part, by Major Bruce, without probable cause (as explained above), that terminated in their favor (as explained below), and caused damage to them. (Doc. 45 at ¶¶ 70–76).

An essential element of a malicious prosecution claim is that the criminal prosecution brought against the accused "terminated in the plaintiff accused's favor."

16

*Butler v. Adkins*, No. 1:19-cv-00221-LAG-TQL, 2020 WL 13863395, at \*3 (M.D. Ga. May 21, 2020) (citing *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003)). Major Bruce argues that Plaintiffs Walter, Maurer, Noyes, and Aira have failed to state valid federal malicious prosecution and First Amendment retaliation claims because those Plaintiffs participated in the District Attorney's office's pretrial diversion program, which did not terminate in their favor. (Doc. 48-1 at 22–25; Doc. 45 at ¶¶ 54, 60). Plaintiffs allege that a dismissal following a pretrial diversion program happens "without any admission of guilt" and is "not inconsistent with a plaintiff's innocence." (Doc. 45 at ¶¶ 65–66 (citing *Lasker v. Hurd*, 972 F.3d 1278 (11th Cir. 2020)).

After indictment, the Plaintiffs who accepted the pretrial diversion offer had their cases dismissed without an admission of guilt. (Doc. 45 at ¶¶ 54, 65). Plaintiffs alleged that the Director for Fulton County's pretrial diversion program confirmed that "diversion participants are not required to admit guilt at any time while in the program." (*Id.* at ¶ 61). Instead, the participant's case is placed on a judicial hold during the enrollment period, and once all program obligations have been completed, the case is dismissed for *nolle prosequi* and the record is restricted. (*Id.* at ¶¶ 61–63).

The Eleventh Circuit has not explicitly addressed whether dismissal after a pretrial diversion program is considered a favorable termination. But, "a formal end to a prosecution in a manner not inconsistent with a plaintiff's innocence is a favorable termination." *Laskar*, 972 F.3d at 1289, 1291. "A formal end to criminal proceedings will satisfy this standard unless it precludes any finding that the plaintiff was innocent of the charges that justified his seizure, which occurs *only* when the prosecution ends in the plaintiff's conviction on or admission of guilt to each charge that justified his seizure." *Id.*

17

at 1295 (emphasis added); *Thompson v. Clark*, 596 U.S. 36, 39 (2022) ("To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction."). Absent Eleventh Circuit precedent precluding a finding of favorable termination under these circumstances, Plaintiffs have plausibly alleged their prosecutions were terminated in a way that is not inconsistent with innocence. *See, e.g.*, *Toala v. City of Miami Beach,* No. 08-20884-CIV, 2008 WL 11411153, at *5 (S.D. Fla. Dec. 3, 2008) (declining to dismiss malicious prosecution claim "at this early stage" in the absence of controlling precedent that pre-trial diversion agreement precludes claim)*.*

Third, Plaintiffs assert a First Amendment retaliation claim. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). To state a First Amendment retaliation claim, a plaintiff must show: (1) they "engaged in constitutionally protected speech, such as his right to petition the government for redress," (2) "the officer's retaliatory conduct adversely affected that protected speech and right to petition," and (3) "a causal connection exists between the officer's retaliatory conduct and the adverse effect on plaintiff's speech and right to petition." *Schilling v. Doherty*, No. 25-10321, 2026 WL 412038, at *3 (11th Cir. Feb. 13, 2026) (citation modified); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).

Here, Plaintiffs plausibly allege a First Amendment retaliation claim against Major Bruce: they allege that (1) they participated in a lawful protest in exercise of their

18

First Amendment rights, (2) Major Bruce retaliated against their constitutionally-protected conduct by causing their arrest without probable cause, and (3) her actions had an adverse effect on their First Amendment rights. (Doc. 45 at ¶¶ 97–99). And as stated above, Plaintiffs have demonstrated, at the motion to dismiss stage, that there was a lack of probable cause for their arrests. *Baker*, 662 F. Supp. at 1322–23 ("The Court has already determined that, based on the allegations in the complaint, there was not even arguable probable cause for Plaintiffs' arrests. And Defendants do not offer any other grounds for dismissing Plaintiffs' First Amendment claims. So, they may proceed.").

### b. Clearly Established

To overcome qualified immunity, Plaintiffs must also demonstrate that the law governing the case was "clearly established" when the violation occurred. *Piazza*, 923 F.3d at 955. "A legal principle must be settled and clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (citation modified). The essential inquiry is whether the officer had "fair warning" that his actions were unconstitutional. *Id.* (citing *Glasscox v. City of Argo*, 903 F.3d 1207, 1217–18 (11th Cir. 2018)). "[O]nly prior decisions from the United States Supreme Court, [the Eleventh Circuit], or the relevant state supreme court can put officers on notice regarding the constitutionality of their actions." *Bradley v. Benton*, 10 F.4th 1232, 1242–43 (11th Cir. 2021) (citing *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021)).

Each of the above constitutional violations are clearly established. As to Plaintiffs' First Amendment retaliation claim, both the Eleventh Circuit "and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1255

19

(11th Cir. 2005) (citing *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.")). Similarly, "[t]here is no question that . . . it is clearly established that an arrest made without probable cause violates the Fourth Amendment." *Davis v. Williams*, 451 F.3d 759, 764 n.8 (11th Cir. 2006). And, there is a "clearly established right under the Fourth Amendment to be free from unreasonable seizure as a result of malicious prosecution." *Williams*, 965 F.3d 1147; *see also Eloy v. Guillot*, 289 F. App'x 339, 347 (11th Cir. 2008) ("Under [the plaintiff's] version of the facts, [the officer] knew that there was not even arguable probable cause to arrest [the plaintiff], but . . . effect[ed] plaintiff's] arrests and prosecution anyway.").

Major Bruce argues that the violations of Plaintiffs' First and Fourth Amendment rights are not clearly established because "there is no case law suggesting that a law enforcement officer can be liable for unlawful seizure for urging other officers . . . to stretch the [plaintiff's] charges" or that an officer "can be held liable for can be held liable for 'inducing' the charges through persuasion." (Doc. 48-1 at 18–19). But it is clearly established in this Circuit that "[a] supervisor may be liable for the unconstitutional acts of his subordinates when . . . a causal connection exists between his actions and the constitutional deprivation." *Christmas v. Nabors*, 76 F.4th 1320, 1330 (11th Cir. 2023) (citing *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008)). "A causal connection exists, in turn, when the 'facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* And where, as here, "the facts support an inference

20

that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," the Eleventh Circuit has repeatedly held that "a causal connection exists." *Id.* (citing *Douglas*, 535 F.3d at 1322).

Here, Plaintiffs allege that Major Bruce "caused [the unlawful] seizure by means of using her authority as a high-ranking officer of the City" to obligate GSU officers to comply, and contributed to Plaintiffs' unconstitutional prosecution by persuading the officers to "induc[e] the charging decisions," even where it was a "stretch." (Doc. 45 at ¶¶ 50, 68, 72). Ultimately, the unlawfulness of the conduct must be apparent from pre-existing law," and it is well-settled that ordering a constitutional violation is a violation itself. *See Coffin v. Brandau*, 642 F. 3d 999, 1013 (11th Cir. 2011). Therefore, it was clearly established that Major Bruce's conduct, as alleged by Plaintiffs, was unlawful.

### 2. Official Immunity

Under Georgia law, municipal law enforcement officers performing official functions generally enjoy official immunity from suits alleging personal liability in tort. *See Bailey v. Wheeler*, 843 F.3d 473, 485 (11th Cir. 2016) (citing *Eshleman v. Key*, 297 Ga. 364 (2015)); GA CONST. art. I, § 2, para. IX(d). "Under this immunity, a state official may not be held liable for injuries caused through his performance of discretionary functions[3] unless he acts 'with actual malice or with actual intent to cause injury.'" *Bailey*, 843 F.3d at 485 (citation omitted). "[A]ctual malice requires more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent

---

[3] Again, it is uncontested that Major Bruce was acting in her discretionary authority with APD when she instructed officers regarding Cop City protestors. (Docs. 45, 48-1).

21

to do something wrongful or illegal. *Id.* at 485–86 (citation modified) (citing *Merrow v. Hawkins*, 266 Ga. 390 (1996)). Thus, "[t]o overcome official immunity, a plaintiff's allegations must demonstrate that the defendant deliberately intended to cause the harm suffered by the plaintiff." *Id.* (citation modified).

Here, Major Bruce argues that Leckert and Dickhaus' malicious prosecution claim under state law is barred by official immunity. (Doc. 48-1 at 21–22). Specifically, Major Bruce argues that Leckert and Dickhaus' allegations are "woefully insufficient to show [Major] Bruce intended to do wrong." (*Id.* at 22). But Leckert and Dickhaus allege exactly that—that Major Bruce urged the other officers to find a charge to bring against the protestors, although she knew it was a "stretch." (Doc. 45 at ¶¶ 26, 50). And when a GSU officer told Major Bruce "that the conduct of protestors was not really chargeable," she replied that "anything we can get would help us out tremendously with the group . . . I know it's a reach." (*Id.* at ¶ 26). Additionally, Major Bruce allegedly told the officers on the scene that charging these the protestors, even where it was a "reach," would help "tremendously" with "this group." (*Id.* at ¶¶ 26, 93). Major Bruce's actions plausibly led to the prolonged detention and charges of Leckert and Dickhaus, too—they allege that "her persuasion was the determining factor in inducing the charging decisions." (*Id.* at ¶¶ 51, 72). Viewed in the light most favorable to Leckert and Dickhaus, these allegations plausibly allege that Major Bruce "deliberately intended to cause the harm"—pretextual arrest, prolonged detention, and constitutional harm—allegedly "suffered by" Plaintiffs. *Bailey*, 843 F.3d at 486 (citation modified); *see also Abercrombie v. Beam*, 728 F. App'x 918, 928 (11th Cir. 2018) ("Under Georgia law, the [facts] may support an inference of actual malice where [allegations] indicates that the police officer arrested the plaintiff

22

despite having knowledge that the plaintiff did not commit the crime for which he was arrested."); *Majeroni v. Chatham Cnty. Bd. of Elections*, 765 F. Supp. 3d 1355, 1376 (S.D. Ga. Feb. 4, 2025) (finding the plaintiff sufficiently pleaded actual malice at the motion to dismiss stage where she alleged the defendants knew she had not violated certain guidelines at a Board of Elections meeting but caused her injury anyway). Accordingly, Major Bruce is not entitled to official immunity on the Georgia malicious prosecution claim against her at the motion to dismiss stage.

### C. Section 1983 Conspiracy Claim

"A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (citation omitted). "The plaintiff attempting to prove such conspiracy must show that the parties reached an understanding to deny the plaintiff his or her rights." *Id.* (citation modified). "[T]he linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992). "But to allege the existence of an agreement on the part of the defendants, a plaintiff need not point to a 'smoking gun;' instead, 'nothing more than an understanding and willful participation . . . is necessary to show the kind of joint action that will subject . . . parties to § 1983 liability.'" *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1148 (N.D. Ga. 2016) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990)).

Plaintiffs allege that all Defendants conspired to violate their constitutional rights under § 1983. (Doc. 45 at ¶¶ 104–07). Many of the same allegations supporting Plaintiffs'

23

allegations of malice against Major Bruce, discussed *supra*, also support their § 1983 conspiracy claim. Plaintiffs allege that Major Bruce urged the other officers on the scene to falsely charge the protestors, which the officers then agreed to and concealed from the public, despite it being a "reach." And Plaintiffs allege that Defendant Fraser's decision to turn off his body camera during the conversation about stretching charges is proof of such concealment. (*Id.* at ¶ 107).

Plaintiffs have plausibly alleged an agreement between the officers that arrested Plaintiffs and Major Bruce. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F3d 1313, 1327 (11th Cir. 2015) (plaintiff alleging officers fabricated a story to justify his arrest after he had been tased and shot and presented false reports in furtherance of the conspiracy). But, the City cannot be found "vicariously liable for alleged constitutional injuries caused by their employees," like Major Bruce, and the complaint makes no specific allegations regarding the City's alleged participation in the conspiracy. *Francois v. City of N. Miami Beach Police Dep't*, No. 1:25-cv-21375-JEM/Reid, 2025 WL 3216638, at *4 (S.D. Fla. Oct. 27, 2025) (citing *Monell*, 436 U.S. at 691). Therefore, the City's motion to dismiss the § 1983 conspiracy claim is **GRANTED**, but Major Bruce's motion as to this claim is **DENIED**.

## CONCLUSION

For these reasons, the City and Major Bruce's Motion to Dismiss Plaintiffs' Third Consolidated Amended Complaint (Doc. 48) is **GRANTED IN PART and DENIED IN PART**. The City's motion as to Plaintiffs' § 1983 conspiracy claim is **GRANTED**, and that claim is **DISMISSED** as to the City only. The remainder of Plaintiffs' claims against the City and Major Bruce may proceed to discovery. Additionally, the City and Major Bruce's

25

Motion to Take Judicial Notice (Doc. 52) is **GRANTED**. The City and Major Bruce's answer is due by **April 14, 2026**. The parties' Joint Preliminary Report and Discovery Plan is due by **May 14, 2026**.

SO ORDERED, this 31st day of March, 2026.

_____
TIFFANY R. JOHNSON
United States District Judge